2003 WY 66

**Rickey Dean INNIS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 02–132.

Supreme Court of Wyoming.

May 29, 2003.

≈97(.5)

Ken Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Senior Assistant Appellate Counsel, Representing Appellant. Argument by Mr. Roden.

Hoke MacMillan, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; and Deborah R. Hochhalter, Student Intern, Representing Appellee. Argument by Ms. Hochhalter.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

Appellant, Rickey Dean Innis (Innis), was convicted of conspiracy to operate a clandestine methamphetamine laboratory.[1]

1. Wyo. Stat. Ann. § 35–7–1059 (LexisNexis 2001)    states:

He was sentenced to a term of not less than ten years nor more than 18 years in the Wyoming State Penitentiary. He appeals, contending the district court did not have subject matter jurisdiction over that crime, and because the trial court committed reversible error by failing to suppress evidence seized at the time of his arrest. We will affirm.

## ISSUES

■ Innis lists these issues:

I. Whether the district court lacked subject matter jurisdiction over the alleged conspiracy?

§ 35-7-1059. Unlawful clandestine laboratory operations; penalties.
(a) It is unlawful for any person to knowingly or intentionally:
(i) Possess a List I or II controlled substance precursor with the intent to engage in a c clandestine laboratory operation;
(ii) Possess laboratory equipment or supplies with the intent to engage in a clandestine laboratory operation;
(iii) Sell, distribute or otherwise supply a List I or II controlled substance precursor, laboratory equipment or laboratory supplies knowing it will be used for a clandestine laboratory operation;
(iv) Conspire with or aid another to engage in a clandestine laboratory operation.
(b) A person who violates subsection (a) of this section is guilty of a felony punishable by imprisonment for not more than twenty (20) years, a fine of not more than twenty-five thousand dollars ($25,000.00), or both.
(c) A person who violates subsection (a) of this section is guilty of a felony punishable by imprisonment for not more than twenty-five (25) years, a fine of not more than fifty thousand dollars ($50,000.00), or both if the judge or jury also finds any one (1) of the following conditions occurred in conjunction with that violation:
(i) Illegal possession, transportation or disposal of hazardous or dangerous material or while transporting or causing to be transported materials in furtherance of a clandestine laboratory operation, there was created a substantial risk to human health or safety or a danger to the environment;
(ii) The intended laboratory operation was to take place or did take place within five hundred (500) feet of a residence, business, church or school; or
(iii) Any phase of the clandestine laboratory operation was conducted in the presence of a person less than eighteen (18) years of age.
(d) A person who violates subsection (a) of this section is guilty of a felony punishable by imprisonment for not more than forty (40) years, a fine

II. Whether the trial court erred in failing to suppress evidence resulting from the search of Mr. Shafer's vehicle because [Innis] was illegally seized during the search in violation of [his] State and Federal constitutional rights?

The State's brief conforms to those issues.

## FACTS

■ Innis and his companions, Mark Shafer and Kelly McConnell, drove to Laramie on May 29, 2001. All three were residents of Fort Collins, Colorado. They went to an Albertson's store and bought a large enough quantity of cold medication so as to raise the suspicions of the register clerk.

of not more than one hundred thousand dollars ($100,000.00), or both if the judge or jury also finds any one (1) of the following conditions occurred in conjunction with that violation:
(i) Use of a firearm;
(ii) Use of a booby trap. [Emphasis added.]
Wyo. Stat. Ann. § 35-7-1058 (LexisNexis 2001) states:
§ 35-7-1058. Definitions
(a) As used in this article:
. . . .
(ii) "Clandestine laboratory operation" means:
(A) Purchasing or procuring chemicals, supplies, equipment or a laboratory location for the illegal manufacture of controlled substances;
(B) Transporting or arranging for the transportation of chemicals, supplies or equipment for the illegal manufacture of controlled substances;
(C) Setting up equipment or supplies in preparation for the illegal manufacture of controlled substances; or
(D) Distributing or disposing of chemicals, equipment, supplies or products used in or produced by the illegal manufacture of controlled substances. [Emphasis added.]
Wyo. Stat. Ann. § 6-1-303 (LexisNexis 2001) states:
§ 6-1-303. Conspiracy; renunciation of criminal intention; venue.
(a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement.
(b) A person is not liable under this section if after conspiring he withdraws from the conspiracy and thwarts its success under circumstances manifesting voluntary and complete renunciation of his criminal intention.
(c) A conspiracy may be prosecuted in the county where the agreement was entered into, or in any county where any act evidencing the conspiracy or furthering the purpose took place.

Most large stores selling those products are on the alert for such quantity purchases because they can be used in the manufacture of methamphetamine. In this case, the Albertson's store manager called the Laramie Police Department because of the quantity of cold medication purchased. The police were informed about the purchase of the cold tablets and given a description of the car used by the group, as well as the license plate number on their car. Although the police were not aware of it at the time the trio was eventually stopped, they had also purchased many more boxes of cold tablets at other Laramie stores.

[¶ 4] At about midnight that same date, a police officer saw the reported car pulling into a Mini–Mart store. The officer pulled up beside the suspect car, but not in a manner so as to block it. The officer asked if the group would answer some questions. The group was cooperative. One of the first questions was whether they had been at an Albertson's store. One individual said, "yes," another, "no." All three men denied purchasing cold tablets. The officer was able to observe an open bottle appearing to contain an alcoholic beverage, which was a violation of a city ordinance.[2] During the course of that investigative stop, the police officer asked all of the men to get out of the car and he did a "pat down" search of the subjects to ensure his safety. When the officer got to Shafer, Shafer admitted he had a glass pipe in his pocket that he used to smoke methamphetamine. He consented to a police officer removing the pipe from his pocket. There was methamphetamine residue on the pipe. Shafer was then arrested and taken to the Laramie Police Department for further processing and questioning. During the course of the stop and arrests, four police officers participated in the process.

While Innis was standing outside the car, and near a waste receptacle, a police officer noticed that Innis wadded up a piece of paper and tried to throw it away. It was recovered by the police and turned out to be a receipt from an Albertson's store for cold tablets. Before being taken away, Shafer gave a written consent for a search of his car and that search turned up other evidence, including hypodermic needles, syringes, scales, baggies, a second "meth" pipe, marijuana, methamphetamine, an open container of an alcoholic beverage, and 38 boxes of cold pills which had been purchased that night by the threesome at various stores in Laramie. Eventually, McConnell was arrested for having an open container of an alcohol beverage, and both McConnell and Innis were arrested for possession of controlled substances. Shortly after those arrests, Shafer admitted to the conspiracy, and all three were arrested on that charge as well.

[¶ 6] During questioning at the police department, Shafer admitted that the three were in Laramie for a "pill run," i.e., to buy cold tablets for the purpose of reprocessing them into methamphetamine. Further, he conceded it was their intention to return to Fort Collins and "cook" a batch of methamphetamine, as they had done two or three other times during the preceding month. Based upon the information obtained from Shafer, as well as other investigative materials already available to the Fort Collins police, a search warrant was obtained in Colorado for a residence owned by McConnell and shared with Innis. That search produced evidence of the existence of a clandestine drug laboratory, which was located in a bedroom used by Innis. Shafer testified that his role in this operation, as well as McConnell's, was to obtain the cold pills and other ingredients, and that Innis was the "cook," i.e., the person who actually knew how to, and did, produce the methamphetamine in his home laboratory.

## DISCUSSION

### Did the District Court Have Jurisdiction Over This Crime

[¶ 7] Innis contends that the conspiracy alleged was to have no effect in Wyoming

---

**2.** Laramie, WY, Municipal Code § 5.08.210 (2003) states:

    **5.08.210 Open containers.**

    A. **No person shall consume or carry in open containers alcoholic liquor or malt beverages** on any street or highway, **in any vehicle,** in any restaurant, hotel dining room or any other public place or public area whatsoever within the city, except places where the sale or service of alcoholic liquor or malt beverages is authorized by Wyoming State Law or city ordinance. [Emphasis added.]

and, therefore, Wyoming courts have no jurisdiction over the crime. Further, he asserts the only thing that occurred in Wyoming was the purchase of cold tablets, which is not a crime, and all other actions and/or intended actions transpired in Colorado.

[¶ 8] Jurisdiction is a question of law to be considered by this Court *de novo*. *Tomlin v. State*, 2001 WY 121, ¶ 5, 35 P.3d 1255, ¶ 5 (Wyo.2001). Wyoming has broad jurisdiction to punish a defendant, over whom it has personal jurisdiction, for an act committed outside this state, but which has an effect in this state. *Rios v. State*, 733 P.2d 242, 244–50 (Wyo.1987) (father of child could be convicted of interfering with child custody in Wyoming, even though neither father nor child had ever been in Wyoming, but mother was). The courts of Wyoming have subject matter jurisdiction over drug conspiracies when the conspirators intend for the conspiracy to have an effect within the state of Wyoming. *Marquez v. State*, 12 P.3d 711, 715–16 (Wyo.2000); and *see Estrada–Sanchez v. State*, 2003 WY 45, ¶¶ 6–7, 66 P.3d 703, ¶¶ 6–7 (Wyo.2003.)

[¶ 9] The parties appear to agree, as do we, that the circumstances of this case pose a question of first impression in this state. Indeed, we have found no analogous case in any jurisdiction. The gist of Innis's argument has two distinct aspects. First, he contends that conspiracy is a crime in and of itself, and that the crime occurred in Colorado, not Wyoming. *Marquez*, 12 P.3d at 715; *Palato v. State*, 988 P.2d 512, 515–16 (Wyo. 1999). Second, he maintains that the conspiracy did not have an intended effect in Wyoming, and there was no criminal act in furtherance of the conspiracy committed in Wyoming. Because this case is one of first impression in some respects, a little background is appropriate:

Conspiracy is an inchoate offense, and is a crime in and of itself. Prohibition of conspiracy serves two distinct purposes: the punishment of group behavior and the control of inchoate activities. The offense derives from special threats posed by organized group criminality. The group danger rationale is predicated on the likelihood that the participants will reinforce each other's determination to carry out the criminal object, the object will be successfully attained, the extent of the injury to society will be large, those who commit it will escape detection, and the group's planning will have a long-term educative effect on its members, with schooling in crime the result.

Although criminalization of conspiracy punishes the inchoate offense by prosecuting the agreement itself, separating and stigmatizing jointly planned criminal activity prior to its completion, the crime of conspiracy is directed at the intended result of that agreement. The basis of conspiratorial liability is not to punish the agreement per se, but, rather, like other inchoate crimes, to punish the firm purpose to commit a substantive crime, while hopefully preventing the actual commission thereof.

15A C.J.S. *Conspiracy* § 98 (2002).

[¶ 10] Moreover, a conspiracy is a continuing offense and it lasts until the final overt act is completed. "Every act in furtherance of it is deemed a renewal or continuance of the conspiracy." 15A C.J.S. *Conspiracy* § 104. We embrace the view that conspiracy is a continuing offense with a situs at the place of the original agreement and also in any other jurisdictions where acts in furtherance of the conspiracy are undertaken. 4 Wayne R. LaFave, Jerold H. Israel and Nancy J. King, *Criminal Procedure* § 16.4(c) at 579 (2d ed.1999).

The elements of a criminal conspiracy include: (1) an object to be accomplished; (2) a plan or scheme embodying means to accomplish that object; (3) an agreement or undertaking between two or more of the defendants whereby they become definitely committed to co-operate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means; (4) an overt act.

15A C.J.S. *Conspiracy* § 108. It is not necessary that the overt act be criminal in character. Indeed, the overt act may be wholly innocent in nature, provided it furthers the purpose of the conspiracy. The overt act merely manifests that the conspiracy is at

work. *Burk v. State,* 848 P.2d 225, 235 (Wyo. 1993). 15A C.J.S *Conspiracy,* §§ 124–125.

[¶ 11] Relying upon these fundamental principles, we conclude that the conspiracy continued and was reaffirmed in Wyoming, and that an overt act, which was central to the purpose of the conspiracy, occurred here. Thus, the district court in Laramie, Albany County, Wyoming had both subject matter and personal jurisdiction over the crime for which Innis was convicted. A conspiracy may be prosecuted in Wyoming: Where any part of the agreement is entered into in Wyoming; where the agreement is entered into elsewhere but has an intended effect in Wyoming; and where the agreement is entered into elsewhere, but an overt act occurs here demonstrating the continuation of the conspiracy. This enumeration is not meant to be exhaustive of all possibilities, but only to summarize those addressed by this Court to date.

## Did the District Court Err in Denying the Motion to Suppress Evidence

[¶ 12] Innis contends that the police officer's initial contact with the threesome, at the Mini–Mart, was an unlawful traffic stop and, thus, the detention of his person was illegal. Continuing, Innis contends that the driver, Shafer, had committed no traffic infractions, no crime had been committed by them purchasing the cold tablets, and no criminal activity that could be associated with them had been reported. Finally, Innis contends that the stop was pretextual and violated Innis's constitutional rights.

[¶ 13] When we review a district court's ruling on a motion to suppress evidence, we do not interfere with the findings of fact unless they are clearly erroneous. When the district court has not made specific findings of fact, we will uphold its general ruling if the ruling is supportable by any reasonable view of the evidence. We consider the evidence in the light most favorable to the district court's ruling because of the district court's ability to assess "the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions" at the hearing on the motion. The constitutionality of a particular

search or seizure is, however, a question of law which we review *de novo. Meek v. State,* 2002 WY 1, ¶ 8, 37 P.3d 1279, ¶ 8 (Wyo.2002) (supporting citations omitted).

[¶ 14] Innis concedes that Shafer consented to a search of the vehicle from which the evidence at issue was seized and directs our attention to this authority, which we must also address as a part of our standard of review:

Even if a person cannot directly challenge the search of a vehicle because of a lack of standing, they may indirectly challenge the search if they can demonstrate that the fruits of the search are a consequence of an illegal seizure of their person. *United States v. Jones,* 44 F.3d 860, 872 (10th Cir.1995); *United States v. McKneely,* 6 F.3d 1447, 1450 (10th Cir.1993); 5 Wayne R. LaFave, *Search and Seizure* § 11.3(e), at 173–74 & fn. 231. This concept derives from the proposition that Fourth Amendment rights are personal in nature and, as such, one has the right to be free from unreasonable searches or seizures of their person. Id. § 11.3(e); *Rakas [v. Illinois],* 439 U.S. [128] at 133–34, 99 S.Ct. [421] at 425 [58 L.Ed.2d 387 (1978)]. Thus, even without standing to directly contest the vehicle search, courts have suppressed evidence seized from a vehicle search as "fruit of the poisonous tree" if the detention or arrest of a person was unlawful. *McKneely,* 6 F.3d at 1450.

An investigatory or *Terry* stop represents a seizure which implicates the Fourth Amendment, requiring the presence of specific, articulable facts and rational inferences giving rise to a reasonable suspicion that a person has committed or may be committing a crime. *Wilson v. State,* 874 P.2d 215, 219–220 (Wyo.1994) (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also McChesney v. State,* 988 P.2d 1071, 1074 (Wyo.1999). There is a dual inquiry for evaluating the reasonableness of an investigatory stop: (1) whether the officer's actions were justified at the inception; and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first instance. *Wil-*

*son,* 874 P.2d at 223 (quoting *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985) and *Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879)). The conduct of an officer is judged by an objective standard which takes into account the totality of the circumstances. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1879–81; *United States v. Lang,* 81 F.3d 955, 965 (10th Cir.1996).

*Putnam v. State,* 995 P.2d 632, 636–37 (Wyo. 2000).

[¶ 15]   Innis concludes the introduction to this argument with this proposition: "If the detention of Mr. Innis was illegal, the evidence resulting from the search of Mr. Shafer's vehicle and Mr. Shafer's statements implicating Mr. Innis in the alleged conspiracy [have] to be suppressed."

[¶ 16]   We have described the various levels of contacts or encounters between citizens and the police in this way: [1] The most intrusive encounter, an arrest, requires justification by probable cause to believe that a person has committed or is committing a crime.   [2] The investigatory stop represents a seizure which invokes Fourth Amendment safeguards, but, by its less intrusive character, requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime.   [3] The least intrusive police-citizen contact, a consensual encounter, involves no restraint of liberty and elicits the citizen's voluntary cooperation with non-coercive questioning. *McChesney v. State,* 988 P.2d 1071, 1074 (Wyo.1999) (supporting citations omitted).

■  [¶ 17]   The district court issued a decision letter, which detailed its findings of fact and conclusions of law.   After hearing and weighing all of the evidence pertinent to the motion to suppress, the district court concluded that the initial stop was consensual, as was the search of Shafer's car and, thus, fits into one of the exceptions where a warrant to search is not required. *See Andrews v. State,* 2002 WY 28, ¶ 18, 40 P.3d 708, ¶ 18 (Wyo.2002).   Thus, Innis's Fourth Amendment rights were not implicated.   The police officer did not activate his overhead lights, nor did he give any other visual or audible signal to bring Shafer's vehicle to a stop.   Shafer pulled the car into the Mini-Mart of his own volition.   The police officer made no attempt to block the car from leaving.   His intention in approaching the vehicle was to ask the trio some questions.   At the officer's request, the occupants of the vehicle were asked to get out of the car, and they all consented to pat down searches for the purpose of ensuring the police officer's safety. Innis was informed that he was not under arrest, although Shafer had been arrested. Innis was asked if he would like to wait inside one of the police vehicles at the scene and he did so.   When the search of Shafer's car produced illegal narcotics, Innis was arrested.   The district court's findings that Innis was not illegally detained or arrested during the initial stop are not clearly erroneous;   indeed, they are consistent with all of the relevant evidence, other than Innis's self-serving testimony to the contrary.   Therefore, the district court properly denied the motion to suppress.

## CONCLUSION

[¶ 18]   The district court had jurisdiction over the conspiracy for which Innis was convicted.   The district court did not abuse its discretion in denying Innis's motion to suppress.   The judgment and sentence of the district court are affirmed.