2005 WY 111

Timothy JELLE, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 04–130.

Supreme Court of Wyoming.

Sept. 7, 2005.

Representing Appellant: Kenneth M. Koski, Public Defender; Donna Domonkos, Appellate Counsel; Diane Courselle, Director, Wyoming Defender Aid Program; and Christopher M. Cook, Intern.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; and D. Michael Pauling, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶1] The appellant, Timothy Jelle, appeals the district court's denial of his motion to suppress statements he made to law enforcement officers. We affirm.

### ISSUES

1. Was the appellant in custody when he was interrogated by law enforcement officers?

2. Were the appellant's statements to law enforcement officers voluntarily made?

### FACTS

[¶2] The appellant entered a conditional guilty plea to felony delivery of a controlled substance. He reserved his right to appeal the district court's denial of his motion to suppress statements he made to law enforcement officers.[1] That motion alleged only that the appellant was subjected to custodial interrogation without first having been advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In a supporting memorandum and during the motion hearing, however, the appellant also claimed that his statements were not voluntary, and the motion was treated as if it included that allegation.

[¶3] The underlying facts of the case were developed at the motion hearing through the testimony of three police officers and the appellant. On January 3, 2002, Michael Dimmick was transported by ambulance from his residence on South Gillette Avenue in Gillette, to the local hospital. Dimmick was unresponsive and in critical condition. He died around noon on that same day. Investigating officers were informed that Dimmick had become ill after consuming psilocybin mushrooms the previous evening, and that the appellant was the source of those mushrooms.[2]

[¶4] The investigating officers responding to Dimmick's residence learned that he and others had ingested psilocybin mushrooms during a party or gathering at a nearby residence on Cottonwood Lane. Detective Sergeant Rozier and Detective Clark went to that location in an unmarked police vehicle. They watched the residence from a distance as they discussed their options and waited for a search warrant. At about 12:40 p.m., a young man later identified as the appellant drove up and entered the residence. The two detectives then walked to the front of the

---

1. W.R.Cr.P. 11(a)(2) states:
   Conditional Pleas.—With the approval of the court and the consent of the attorney for the state, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to seek review of the adverse determination of

any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

2. Psilocybin is a controlled hallucinogenic substance. Wyo. Stat. Ann. § 35–7–1014(d)(xix) (LexisNexis 2005).

house and knocked on the door. They were greeted by a woman named Vicky Abril, who angrily shouted at them for awakening her and demanded that they leave. They did so, returning to their police car.

[¶ 5] Soon thereafter, two more unmarked police cars arrived, driven by Detectives Boisvert and Wells. The four detectives were discussing the situation when the appellant left the residence, got back in his car, and began to drive away. Detectives Boisvert and Clark got into one police car and followed the appellant into the alley. Detectives Rozier and Wells got into another police car and started down the alley from the opposite direction. The appellant stopped his vehicle in response to Detective Boisvert having activated the flashing grill lights in his vehicle.

[¶ 6] Detective Clark testified that he walked up to the appellant's car door, identified himself as a police officer, and told the appellant that the officers were trying to find out what had happened at the Cottonwood Lane residence the night before.[3] Detective Clark testified that he told the appellant he was not under arrest and he did not have to talk to them if he did not want to do so. Detective Boisvert then walked up while Detective Clark began to question the appellant. After a few minutes, Detective Clark left the conversation to speak with Detective Rozier, who had remained in the other police car with Detective Wells.

[¶ 7] Detective Boisvert testified that the appellant was sitting in his vehicle for the first minute of the conversation, but got out upon Detective Clark's request. When Detective Clark left to speak to Detective Rozier, Detective Boisvert took over questioning the appellant. The appellant admitted being at the Cottonwood Lane residence the night before, but denied that there were any "nar-

cotics" there.[4] He also admitted that he "might have" smoked marijuana with Dimmick "at some point," but had not "done anything stronger." In response to Detective Boisvert's statement that others who were present the night before had identified him as the source of the psilocybin mushrooms, the appellant claimed that he had not provided the mushrooms and "wouldn't know where to get it." Detective Boisvert then asked the appellant if he had any "narcotics" on his person or in his vehicle. The appellant replied that he did not, and consented to Detective Boisvert's search of both. No controlled substances were found.[5]

[¶ 8] Detective Wells testified that, when she saw Detective Boisvert begin to search the car, she "walked up there to make sure that there were two officers there." She introduced herself to the appellant as a police officer and asked if he would talk to her about what had happened the night before. He agreed. During their conversation, Detective Boisvert was searching the appellant's car and the other two detectives were in one of the police vehicles.

[¶ 9] Upon the appellant once again denying that he brought the mushrooms to the Cottonwood Lane residence, Detective Wells told him that he "needed to look at the big picture." She then explained to him that others who had ingested the mushrooms might also be harmed, and they needed to find out if the mushrooms had caused Dimmick's death.[6] The appellant then became emotional and admitted that he had supplied the mushrooms. He began to cry and said that he felt responsible for Dimmick's death.

[¶ 10] Detective Wells testified that she probably concluded their discussion by lecturing the appellant about his drug use, and that she patted him on the back to console

---

3.  None of the detectives were wearing police uniforms, but were in "street clothes."

4.  The appellant contends in his appellate brief that psilocybin is not technically a "narcotic drug" as that term is defined by statute. *See* Wyo. Stat. Ann. § 35–7–1002(a)(xv) (LexisNexis 2001). The implication is that he was not lying by denying the presence of "narcotics." While that may be true, we do not find it material to resolution of the issues before this Court.

5.  Detective Boisvert testified that his purpose in searching the appellant and his vehicle was to make sure no controlled substances were being taken from the Cottonwood Lane house before a search warrant could be obtained.

6.  The appellant had learned of Dimmick's death while he was briefly in the Cottonwood Lane house just before the officers contacted him.

him. As Detective Boisvert concluded the search of the vehicle, Detective Wells asked the appellant to give her a written statement, which he did, writing it on the trunk of the car.[7] Detective Wells then told the appellant that an autopsy would be done on Dimmick's body to determine the cause of death, and that he could be charged with delivery of a controlled substance. The appellant then drove away, which he was able to do without either of the police cars having to be moved.

[¶ 11] The appellant's brief testimony at the motion hearing differed from that of the detectives. In particular, he testified that, not only did the detectives not volunteer a statement that he was free to go and need not answer their questions, they said instead, when he asked each of them in turn, that he could not leave "until [we] are done asking questions." He also testified that he did not feel as though he was free to leave until after Detective Wells told him he could leave, after he gave the written statement. All who testified agreed that the entire encounter lasted thirty minutes or less.

[¶ 12] In the decision letter supporting the district court's denial of the motion to suppress, the district court reviewed the above facts and then set forth three conclusions of law: (1) the officers had made a proper investigatory stop of the appellant; (2) the appellant was not in custody; and (3) the appellant's statements, including the written statement, were voluntarily made.

## STANDARD OF REVIEW

[¶ 13] Our standard for reviewing the denial of a motion to suppress has been reiterated many times:

"Findings of factual issues made by the district court considering a motion to suppress are not disturbed on appeal unless they are clearly erroneous. *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994). Since the district court conducts the hearing on the motion to suppress and has the opportunity to assess the credibility of the witnesses, weigh the evidence, and make the

necessary inferences, deductions, and conclusions, evidence is viewed in the light most favorable to the district court's determination. *Id.* [I]ssue[s] of law ... [are] reviewed de novo. *Id., Brown v. State*, 944 P.2d 1168, 1170–71 (Wyo.1997)."

*Mackrill v. State*, 2004 WY 129, ¶ 12, 100 P.3d 361, 364 (Wyo.2004) (*quoting McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999)). *See also Vassar v. State*, 2004 WY 125, ¶ 12, 99 P.3d 987, 992 (Wyo.2004) and *Grant v. State*, 2004 WY 45, ¶ 10, 88 P.3d 1016, 1018 (Wyo.2004).

[¶ 14] This standard includes application of the following law to the issue of *Miranda* and custodial interrogation:

Statements made by a suspect during custodial interrogation are admissible into evidence, providing certain advisements are made. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements made during custodial interrogation must be excluded upon a showing that the defendant was not advised of his *Miranda* rights. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), *cert. denied*, 535 U.S. 1106, 122 S.Ct. 2315, 152 L.Ed.2d 1069 (2002). In *Dickerson*, 530 U.S. at 435, 120 S.Ct. 2326, 147 L.Ed.2d 405, the United States Supreme Court stated:

"Accordingly, we laid down 'concrete constitutional guidelines for law enforcement agencies and courts to follow.' ... Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as 'Miranda rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be

---

7. The written statement was admitted into evidence at the motion hearing and is contained in the record on appeal. It reads as follows: "At about 9:00 pm I brought some mushrooms over to the Wright's house. Seth and Mike said they would try them with me, now Mike is dead. Tim Jelle"

appointed for him prior to any questioning if he so desires.' "

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. *See also Glass v. State,* 853 P.2d 972, 976 (Wyo. 1993) and *Wunder v. State,* 705 P.2d 333, 334 (Wyo.1985). Neither general on-the-scene questioning as to facts surrounding a crime nor statements volunteered freely without compelling influences are considered to fall within this definition. *Miranda,* 384 U.S. at 477–78, 86 S.Ct. 1602.

The totality of the circumstances must be considered in determining whether a suspect is in custody when questioned. In *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the United States Supreme Court rejected the notion that a person who is the "focus" of a criminal investigation is, by that fact, "in custody." The United States Supreme Court made clear that *"Miranda* implicitly defined 'focus,' for its purposes, as 'questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Id.* at 347, 96 S.Ct. 1612 (*quoting Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694) (emphasis in original). The proper inquiry is to ask "whether a reasonable man in Appellant's position would have considered himself to be in police custody." *Glass,* 853 P.2d at 976.

Several factors are relevant to be considered in determining whether a restraint is "custodial" for *Miranda* purposes. Among these are: (1) whether a suspect is questioned in familiar or neutral surroundings; (2) the number of police officers present; (3) the degree of physical restraint and whether it is comparable to those associated with a formal arrest; and (4) the duration and character of the interrogation. *See* 2 Wayne R. LaFave, Jerold H. Israel and Nancy J. King, *Criminal Procedure* § 6.6(c) at 527 (2nd ed.1999); *see also Wunder,* 705 P.2d at 335. The nature of the interrogator, the nature of the suspect,

the time and place of the interrogation, the progress of the investigation at the time of the interrogation, whether the suspect is informed that his detention would not be temporary, and the elapsed amount of time between questioning and the arrest may be important factors as well. *Wunder,* 705 P.2d at 335; J.F. Ghent, Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring that Suspect be Informed of His Federal Constitutional Rights Before Custodial Interrogation,* 31 A.L.R.3d 565 (1970). No one factor alone will necessarily establish custody for *Miranda* purposes, and not all factors will be relevant to a given case.

*Gunn v. State,* 2003 WY 24, ¶¶ 7–10, 64 P.3d 716, 719–20 (Wyo.2003).

[¶ 15] A determination that a defendant was subject to custodial interrogation for purposes of *Miranda* does not answer the separate question of whether any statements given were given voluntarily. Our standard for reviewing the district court's ruling on the latter issue emulates our general standard for the review of rulings on motions to suppress evidence:

"A trial court's ruling on a defendant's motion to suppress a statement on the grounds that it was involuntary, is reviewed de novo. In conducting such a review, we defer to the trial court's findings of fact unless those findings are clearly erroneous. This Court considers all the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. The Fifth and Fourteenth Amendments to the United States Constitution, and Wyoming Constitution Article 1, §§ 6 and 11, require that confessions be voluntary. A statement that is obtained by coercion is not trustworthy and may not be used at trial against the person who made it. A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial. A statement is considered to be voluntary if the defendant of his own free and deliberate choice, and not because of intimidation,

coercion or deception, makes it. The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary. *Edwards v. State,* 973 P.2d 41, 48 (Wyo. 1999)."

*Gordon v. State,* 2004 WY 105, ¶ 13, 97 P.3d 64, 68 (Wyo.2004) (*quoting Hannon v. State,* 2004 WY 8, ¶ 12, 84 P.3d 320, 328 (Wyo. 2004)). *See also Gunn,* 2003 WY 24, ¶ 5, 64 P.3d at 719 (voluntariness is a question of law reviewed *de novo* ). We have identified the following factors that trial courts may consider in determining whether a statement was made voluntarily:

" '[T]he atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made[,] ... whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system.' "

*Gunn,* 2003 WY 24, ¶ 12, 64 P.3d at 716 (*quoting Simmers v. State,* 943 P.2d 1189, 1195–96 (Wyo.1997); *State v. Evans,* 944 P.2d 1120, 1125–26 (Wyo.1997); *People v. Gennings,* 808 P.2d 839, 845 (Colo.1991); and *People v. Pearson,* 725 P.2d 782, 783 (Colo. 1986)).

## DISCUSSION

[¶ 16] The State makes no argument that the questioning of the appellant was anything other than interrogation as contemplated by *Miranda.* That leaves as the relevant issue the question of whether the appellant was in custody during that interrogation. Under the legal standards set forth above, the question of whether a defendant is in custody is answered by looking to the "totality of the circumstances." That is the same standard, of course, for determining whether a statement was made voluntarily. In its decision letter, the district court went through that process by summarizing the testimony from the hearing, and then concluding both that the appellant was not in custody and that his statements were made voluntarily. Those are the conclusions that we now review *de novo.*

[¶ 17] The district court emphasized certain facts in concluding that the appellant was not in custody and that his statements were voluntarily made. First, the appellant's car was not "blocked in" by the detectives' cars and he was able to drive away at the end of the encounter. Second, the appellant was informed that he was not under arrest and that he did not have to talk to the officers.[8] Third, the detectives were in plain clothes and immediately identified themselves as police officers. Fourth, the entire encounter lasted less than thirty minutes. Fifth, there were no threats, raised voices, or weapons drawn. Sixth, the appellant was not arrested or restrained. And seventh, Detective Wells was forthright in telling the appellant he could be charged with a crime.

[¶ 18] These findings by the district court are supported by evidence in the record and are, in our view, sufficient basis for the district court's conclusions. Other facts contained in the motion hearing testimony provide additional reasons for denial of

---

**8.** Without saying so directly, the district court clearly resolved any credibility contest against the appellant and in favor of the detectives. The appellant testified that he was not told that he was free to go or that he did not have to talk to the officers. There is nothing in the record to suggest that the district court's credibility finding was clearly erroneous.

the motion: (1) the encounter occurred in neutral territory, in an area where the appellant had been before and with which he was familiar; (2) the appellant only noticed three officers at the scene, and at no time did the officers use "mass presence" to intimidate the appellant; (3) no team or tandem interrogation took place; and (4) the questioning occurred in a public place in broad daylight. We conclude that the State met its burden of proving by a preponderance of the evidence that the appellant was not in custody and that his statements were voluntarily made.[9]

[¶ 19] There is one more matter we must discuss. As mentioned above, the motion to suppress mentioned only an alleged *Miranda* violation, but the supporting memorandum and argument at the hearing also raised the question of the voluntariness of the appellant's statements to law enforcement. In addition, the appellant also contended in the memorandum that the initial stop of his vehicle was not valid. Indeed, the district court addressed this issue before reaching its conclusions on the custody and voluntariness issues. Apparently, the appellant has abandoned this issue on appeal, inasmuch as he states in his appellate brief that, by concluding that the initial stop was reasonable, the district court "answered the wrong question." Nevertheless, because the issue was raised to some extent below, we will briefly comment upon it.

[¶ 20] The district court concluded that Detective Boisvert's stopping of the appellant's vehicle was a second-tier investigatory stop under the following recognized construct:

> In determining whether encounters between police and citizens are constitution-

ally valid, we have classified these encounters into three categories or tiers.

> "[1] The most intrusive encounter, an arrest, requires justification by probable cause to believe that a person has committed or is committing a crime. [2] The investigatory stop represents a seizure which invokes Fourth Amendment safeguards, but, by its less intrusive character, requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime. [3] The least intrusive police-citizen contact, a consensual encounter, involves no restraint of liberty and elicits the citizen's voluntary cooperation with non-coercive questioning."

*McChesney*, 988 P.2d at 1074 (*quoting Wilson v. State*, 874 P.2d 215, 220 (Wyo.1994)); *see also Innis v. State*, 2003 WY 66, ¶ 16, 69 P.3d 413, 419 (Wyo.2003). The appellant does not suggest that the encounter was anything other than an investigatory stop; instead, he alleges that the stop did not meet the following test for constitutional validity in such a circumstance:

> *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny establish that law enforcement officers may stop and temporarily detain citizens short of arrest if the officer has a reasonable suspicion that a person has committed or may be committing a crime.

*McChesney*, 988 P.2d at 1075 (*citing Wilson*, 874 P.2d at 220). In turn, whether "reasonable suspicion" exists is determined as follows:

---

9. The appellant was seventeen years old at the time, but nothing has been made of this "age factor." Neither has the appellant attempted to overcome the record evidence of voluntariness with any evidence of a mental condition, or lack of maturity, or other factor that could have affected voluntariness. *See Gunn*, 2003 WY 24, ¶ 11, 64 P.3d at 720–21 (*quoting Lewis v. State*, 2002 WY 92, ¶ 18, 48 P.3d 1063, 1068 (Wyo. 2002)) (once the State has met its burden, a defendant may be required to present evidence demonstrating involuntariness). *But see also Yarborough v. Alvarado*, 541 U.S. 652, 667, 124

S.Ct. 2140, 2151, 158 L.Ed.2d 938 (2004) (custody test for *Miranda* purposes is an objective test under which the suspect's age and experience are not relevant factors). While both questions-whether a defendant was in custody for *Miranda* purposes, and whether his statements were voluntarily made-are answered by looking to the totality of the circumstances, voluntariness, unlike custody, is not limited to an objective test. When voluntariness is at issue, we look to the "nature of the defendant." *See CSC v. State*, 2005 WY 106, ¶¶ 28–35, 118 P.3d 970, 977–78 (Wyo.2005) (No. C–04–12, published 8/30/05) and *Hannon*, 2004 WY 8, ¶ 51, 84 P.3d at 340.

In order to establish the reasonable suspicion necessary to justify a second tier *Terry* or investigatory stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences [drawn] from those facts, reasonably warrant that intrusion." *Olson v. State*, 698 P.2d 107, 109 (Wyo.1985) (quoting *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880); *Wilson v. State*, 874 P.2d at 220.

> "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture,' *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion."

*McChesney*, 988 P.2d at 1075. We have previously recognized that it is difficult precisely to articulate what "reasonable suspicion" and "probable cause" mean, but we have also distinguished between them as follows:

> "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

*Damato v. State*, 2003 WY 13, ¶ 18, 64 P.3d 700, 707–08 (Wyo.2003) (*quoting United States v. Tuter*, 240 F.3d 1292, 1296 n. 2 (10th Cir.), *cert. denied* 534 U.S. 886, 122 S.Ct. 195, 151 L.Ed.2d 137 (2001) and *citing Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). "Reasonable suspicion" should be evaluated through the application of common sense and ordinary human experience. *Damato*, 2003 WY 13, ¶¶ 16–17, 64 P.3d at 707 (*quoting United States v. Wood*, 106 F.3d 942, 946 (10th Cir.1997) and *Ornelas v. United States*, 517 U.S. 690, 695–

96, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996)).

[¶ 21] Simply put, the question is why Detective Boisvert stopped the appellant's car. He did so because the detectives had learned the following from interviews with several people present at Dimmick's residence on South Gillette Avenue: (1) Dimmick became ill and later died, after consuming psilocybin mushrooms the evening before at the Cottonwood Lane residence; (2) the appellant was the identified source of the psilocybin mushrooms; (3) search warrants were being obtained for both residences; (4) the registered owner of the vehicle, Shelli Jelle, had the same last name as the named suspect; and (5) the person driving the vehicle, later identified as the appellant, had just entered and quickly left the Cottonwood Lane residence. Certainly, these circumstances justified an investigatory stop of the appellant's car. Not only did the detectives have a reasonable suspicion that a crime had occurred (delivery of a controlled substance), and that the appellant had committed that crime, they also had an immediate need to ensure that evidence was not being removed from the scene of that crime.

### CONCLUSION

[¶ 22] The detectives had reasonable suspicions that justified the investigatory stop of the appellant's car. The appellant was not in custody while he was being questioned, and the statements he made were voluntary.

[¶ 23] We affirm.