# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 48

### OCTOBER TERM, A.D. 2020

### March 31, 2021

MAXWELL B. SCHWARTZ,

Appellant
(Defendant),

v.

S-20-0186

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Converse County*
*The Honorable F. Scott Peasley, Judge*

*Representing Appellant:*
> Office of the State Public Defender: Diane M. Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel. Argument by Mr. Westling.

*Representing Appellee:*
> Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine M. Mercer, Assistant Attorney General. Argument by Ms. Mercer.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]   A jury convicted Maxwell Schwartz of second-degree murder and aggravated assault in the death of his brother, Joseph Schwartz.[1]  On appeal, Max argues the district court erred when it denied his motion to suppress statements he made at the scene of the crime and during a recorded interview.  He asserts that admission of the statements violated his Fifth and Fourteenth Amendment rights because law enforcement did not inform him of his *Miranda* rights before questioning him at the scene, and that he was under the influence of methamphetamine at the time of the recorded interview, making his statements involuntary.  We affirm.

### ISSUES

[¶2]   We address these issues:

> I.  Did the district court err when it found Max's statements at the scene fell under the public safety exception to *Miranda* and denied his motion to suppress?

> II. Did the district court err when it found that Max voluntarily waived his *Miranda* rights and denied his motion to suppress his recorded statement?

### FACTS

[¶3]   Sergeant Schmidt, and Officers Jones and Zwiebel responded to an undefined emergency call in Douglas, Wyoming.  They soon learned it was a stabbing.  When the officers arrived, they approached the front door and looked into the home through a nearby window.  Sergeant Schmidt saw a woman and two crying children who looked scared and heard a man screaming hysterically.  While the officers were still outside, dispatch informed them that the call was for a shooting.  Sergeant Schmidt announced himself and knocked on the door several times.  Max slid across the floor, unlocked the door, and then scooted back into the kitchen.  All three officers entered the home with their guns drawn.

[¶4]   Sergeant Schmidt testified that he entered the kitchen and saw a body on the floor to the left of the door (later identified as Joe Schwartz), Max sitting on the floor to the right of the door, and a woman named Kelsi Stotsky standing nearby.[2]  Almost

---

[1] We refer to the defendant and victim by their first names since they share the same last name.

[2] An autopsy revealed that Joe died from one of three stab wounds in his chest which severed the subclavian artery.  The medical examiner thought Joe could have survived the gunshot wound because it did not hit any vital structures.

1

immediately, Sergeant Schmidt asked Max if he shot Joe, and Max told him no. When Sergeant Schmidt asked who shot Joe, Max responded that Joe had shot himself. The other officers then left the kitchen to clear the rest of the house while Sergeant Schmidt remained in the kitchen with Max and Ms. Stotsky. He asked Max where the gun was, but Max could not respond. Ms. Stotsky answered and said, "It's right here," referring to the counter. Sergeant Schmidt asked if Max was on any drugs, and Ms. Stotsky responded he was high on methamphetamine. This was later confirmed by a blood test.

[¶5]    Sergeant Schmidt was concerned about Max's wellbeing and asked the paramedics to examine him and to transport him to the hospital. An officer accompanied Max to the hospital and was later joined by a special agent of the Wyoming Division of Criminal Investigation (DCI). Hospital staff sedated Max, and he was later discharged and taken to the jail. Max spent most of the following day asleep. Later that evening, Agents Holder and Carpenter of DCI advised Max of his *Miranda* rights and asked if he would answer some questions. Max declined to speak with them, so they left Douglas to return to Casper. While on the road, Agent Holder received a phone call indicating that Max had asked to speak with them. The agents returned to Douglas and again advised Max of his *Miranda* rights. Max said he did not understand his rights and asked for an explanation, and Agent Holder re-advised Max of his rights. Max then waived his rights and spoke with the agents. During the interrogation, Max was sometimes confused and his answers included discussion of demons and a reference to "possession" of the house; however, at other points, his answers were clear and responsive.

[¶6]    Max moved to suppress both the statements he made to Sergeant Schmidt at the scene and the statements he made to the DCI agents. He argued that Sergeant Schmidt did not inform him of his *Miranda* rights prior to questioning him, and therefore his Fifth Amendment rights would be violated if the statements were admitted. He also argued the statements he made to the DCI agents were involuntary because he was under the influence of methamphetamine at the time.

[¶7]    The district court denied the motion to suppress. It held the public safety exception applied to the statements Max made at the scene, citing *New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984). The district court reasoned that the questions were objectively reasonable to secure the officers' safety because the scene was chaotic, the officers did not know who was in the house or where they were, and Max was on the floor with a dead body. The district court concluded that "[a]n officer walking into a situation such as this would be expected to spontaneously inquire as to whether there was an active shooter in the household." The district court also denied Max's motion to suppress the statement given to DCI. It found no indication that Max was under the influence of methamphetamine during the second interview, no coercion, and it concluded that Max voluntarily waived his rights and spoke with the agents.

2

[¶8]    At trial, the State elicited testimony about Max's statements at the scene during its case-in-chief.  Max testified in his own defense and stated he did not remember the interrogation by Agents Holder and Carpenter in response to several questions by his attorney and the State.  The State also questioned Max about his statements to Sergeant Schmidt as impeachment evidence.  The jury found Max guilty of second-degree murder and aggravated assault, and this appeal followed.

## STANDARD OF REVIEW

[¶9]    When we review the denial of a motion to suppress, we adopt the district court's factual findings unless they are clearly erroneous.  *Rodriguez v. State*, 2018 WY 134, ¶ 15, 430 P.3d 766, 770 (Wyo. 2018).  Because the district court had the opportunity to "assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions," we view the evidence in the light most favorable to its decision.  *Id.*  We review issues of law de novo.  *Jelle v. State*, 2005 WY 111, ¶ 13, 119 P.3d 403, 407 (Wyo. 2005) (citing *Mackrill v. State*, 2004 WY 129, ¶ 12, 100 P.3d 361, 364 (Wyo. 2004)).

## DISCUSSION

### I.    *The public safety exception applies to Max's statements at the scene*

[¶10] Max argues Sergeant Schmidt should have advised him of his rights prior to asking if he shot Joe, and the district court erred when it denied his motion to suppress.  *Miranda* requires statements made by a suspect during a custodial interrogation be excluded if the suspect is not given the requisite advisements.  *Jelle*, 2005 WY 111, ¶ 14, 119 P.3d at 407 (citing *Gunn v. State*, 2003 WY 24, ¶ 7, 64 P.3d 716, 719 (Wyo. 2003)).  We consider the totality of the circumstances to determine whether a suspect is subjected to a custodial interrogation.  *Jelle*, 2005 WY 111, ¶ 14, 119 P.3d at 408.  The key question is whether a reasonable man in the suspect's position would consider himself in police custody.  *Barnes v. State*, 2008 WY 6, ¶ 14, 174 P.3d 732, 737 (Wyo. 2008) (citing *Gompf v. State*, 2005 WY 112, ¶ 31, 120 P.3d 980, 988 (Wyo. 2005)).  The district court determined that Max was subjected to a custodial interrogation, and we agree.  Sergeant Schmidt and Officers Jones and Zwiebel entered the kitchen with their weapons drawn, and Sergeant Schmidt testified during the suppression hearing Max was not free to leave and he informed Ms. Stotsky, in Max's presence, that she could not leave the kitchen.  A reasonable person in Max's situation would not feel free to leave.

[¶11] The State argues that Max's statements at the scene fall under the public safety exception to *Miranda*.  *Quarles*, 467 U.S. at 656, 104 S.Ct. at 2631-32.  Max asserts the district court's reliance on the public safety exception was misplaced because Sergeant Schmidt's inquiry went directly to the ultimate question of guilt.  The *Quarles* Court explained "the doctrinal underpinnings of *Miranda* [do not] require that it be applied in

all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id*. It described "a kaleidoscopic situation . . . where spontaneity rather than adherence to a police manual is necessarily the order of the day." *Id*. at 656, 104 S.Ct. at 2631.

[¶12] Contrary to Max's argument, many cases apply the public safety exception to questions by law enforcement officers that address the ultimate question of guilt. For example, in *U.S. v. Lackey*, the defendant was charged with possession of a firearm by a restricted person. 334 F.3d 1224, 1225 (10th Cir. 2003). The reporting witness identified Mr. Lackey as the person who fired shots at her house, and officers went to arrest him. *Id*. They encountered him in the parking lot of an apartment building where he was believed to be living and asked him if he had anything on his person that would hurt them. *Id*. Mr. Lackey asked why he was being arrested, and the officer responded he would explain in a minute. He handcuffed Mr. Lackey and then asked, "Do you have any guns or sharp objects on you?" Mr. Lackey responded he did not, but there was a gun in the car. *Id*. at 1225-26. The court determined this inquiry fell squarely under the public safety exception because if Mr. Lackey had a gun, it could have been used against the officers, or someone could have been injured when he was frisked subject to arrest. *Id*. at 1227. It reached this conclusion even though the admission went directly to the ultimate question of guilt under the crime charged.

[¶13] Rather than analyzing the wording of the unwarned questions, we look at the totality of the circumstances to determine whether the public safety exception applies, including: the nature of the crime, the knowledge of the officer at the scene, whether the defendant is restrained, whether the defendant is alone, and the nature of the scene. *See, e.g.*, *Quarles*, 467 U.S. 649, 104 S.Ct. 2626 (question about location of gun fell under public safety exception because it was somewhere in a grocery store where the public might access it); *Barnes*, 2008 WY 6, 174 P.3d 732 (public safety exception applied to question about the amount of drugs Mr. Barnes used because he complained of dizziness and shortness of breath and it was possible he was suffering from a drug overdose); *U.S. v. Mikolon*, 719 F.3d 1184 (10th Cir. 2013) (question about presence of drugs or weapons in defendant's truck did not fall under the public safety exception because defendant was secured and away from the truck at the time); *Perez v. People*, 479 P.3d 430 (Colo. 2021) (After a traffic stop and foot chase, officers discovered shotgun rounds in defendant's pocket and asked where the gun was. The court determined the public safety exception applied because the officer could have reasonably believed the defendant was armed at some point during the chase and that could pose a threat to public safety.); *State v. Campbell*, --- So.3d ---, 2020 WL 6580522 (La. 2020) (per curiam) (public safety exception applied to question "what happened?" after officers responded to a 911 call in which a child reported that her father had shot her mother because officers did not know the location of the child or weapon, or who was involved); *State v. Forshee*, 455 P.3d 1025 (Or. App. 2019) (the public safety exception applied when officer responded to a workplace shooting and asked the first person he saw "what's your involvement here?"

4

because he arrived on a scene where an unknown shooter was at large and did not know if the defendant was the perpetrator, witness, or victim); *see also U.S. v. Fautz*, 812 F. Supp. 2d 570, 624-29 (D.N.J. 2011) (including extensive overview of cases involving the public safety exception).

[¶14]  The situation here developed very rapidly.  In the three minutes it took Sergeant Schmidt to get from the station to the door of the house, the call evolved from an unspecified medical emergency, to a stabbing, to a shooting.  He could hear Max and the children screaming before he entered the house.  Max could not stand up and continued yelling after the officers entered the house.  The officers saw Joe, dead on the floor, and did not immediately see the gun.  When Sergeant Schmidt arrived, the scene was chaotic and he did not know what had happened, who was there, where the weapon was, or if there was continuing danger to the public or people in the home (including the officers).  Sergeant Schmidt's questions were spontaneous and in response to the type of kaleidoscopic situation described by the *Quarles* court.  The district court did not err in concluding the public safety exception applied.

## II.  *The district court did not err when it determined Max voluntarily waived his Miranda rights during his DCI interrogation*

[¶15]  Max argues the district court erred when it failed to suppress the statement he gave to Agents Holder and Carpenter the day after Joe died because his statement was involuntary.  Voluntariness is a question of law that we review de novo.  *Gunn*, 2003 WY 24, ¶ 5, 64 P.3d at 719.  "In determining voluntariness, [we] examine[] the totality of the circumstances that existed when the statements were made."  *Id*. at ¶ 18, 64 P.3d at 722.  Courts consider many factors in determining whether a statement was made voluntarily, including:

> "[T]he atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made[,] . . . whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in

5

> questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system."

*Id.* at ¶ 12, 64 P.3d at 721 (alterations in original) (quoting *Simmers v. State*, 943 P.2d 1189, 1195-96 (Wyo. 1997)). Agent Holder testified that no one threatened Max or offered him anything in exchange for his testimony. And, while Max was under arrest and at the police station, he asked to speak to the DCI agents, and they read him his *Miranda* rights prior to questioning and did not ask any substantive questions until Max confirmed that he understood.

[¶16] Max argues his statements to Agents Holder and Carpenter were involuntary because he was under the influence of methamphetamine at the time. However, intoxication, without more, does not render a statement involuntary. *Siler v. State*, 2005 WY 73, ¶ 25, 115 P.3d 14, 26 (Wyo. 2005) (citing *Stone v. State*, 745 P.2d 1344, 1348 (Wyo. 1987)). When an appellant alleges his statement was involuntary due to intoxication, we look to whether the appellant "was so intoxicated . . . he was unable to appreciate the nature and consequences of his statements." *Siler*, 2005 WY 73, ¶ 25, 115 P.3d at 26 (quoting *Lonquest v. State*, 495 P.2d 575, 582 (Wyo. 1972)). The district court found that Max's positive methamphetamine test occurred fourteen and a half hours before the interrogation.[3] It found his answers during the interrogation were sometimes nonsensical, but at other points were responsive and clear. And finally, it found that Agent Holder was qualified to recognize whether a person is under the influence of drugs and alcohol, and he testified he did not believe Max was under the influence at the time of the interrogation.

[¶17] Further, even if Max was under the influence of methamphetamine during the interrogation, "[i]nvoluntariness requires coercive state action, such as trickery, psychological pressure, or mistreatment." *State v. Evans*, 944 P.2d 1120, 1125 (Wyo. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986)); *see also Carter v. State*, 2010 WY 136, ¶ 15, 241 P.3d 476, 485 (Wyo. 2010). Max originally declined to speak with DCI, and he asserts the fact he was interrogated later in the evening indicates he was coerced into waiving his rights. The record, however, does not support this assertion.

[¶18] Instead, the record shows Agents Holder and Carpenter first saw Max late in the morning on the day after Joe died, about four hours after he was released from the

---

[3] The parties stipulated that the positive methamphetamine test occurred at 2:37 a.m. The interview with the DCI agents was conducted at 7:00 p.m.—sixteen and a half hours after the positive test result.

hospital, but Max was asleep, so they left.  Agents Holder and Carpenter returned around five o'clock in the evening, read Max his *Miranda* rights, Max said he did not want to speak with them, and they left.  On the drive back to Casper, the agents received a call from a staff member at the jail who said Max wanted to speak with them.  Agents Holder and Carpenter returned to Douglas and spoke with Max at the jail around seven o'clock that evening.  The agents recorded the interrogation.  They informed Max of his *Miranda* rights, and Max initially stated he did not understand and asked the agents to explain them.  After the agents went through his *Miranda* rights a second time, Max affirmatively declared he understood his rights and then willingly spoke with the agents and answered their questions.  Nothing in the record demonstrates the type of coercive state action necessary to render a statement involuntary.

## *CONCLUSION*

[¶19]  The public safety exception applies to Max's statements at the scene of the crime. Furthermore, Max was advised of his *Miranda* rights at the police station, he stated he understood them, and he waived his rights.  His statements at the station were voluntary and not the result of coercion.  The district court did not err when it denied Max's motion to suppress.  We affirm.