# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 101

### APRIL TERM, A.D. 2022

### August 19, 2022

PNS STORES, INC. d/b/a "BIG LOTS",

Appellant
(Defendant),

v.

S-21-0294

CAPITAL CITY PROPERTIES, LLC,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
The Honorable Steven K. Sharpe, Judge

*Representing Appellant:*
Andrew F. Sears and Patrick M. Brady of Sundahl, Powers, Kapp & Martin, LLC, Cheyenne, Wyoming. Argument by Mr. Sears.

*Representing Appellee:*
Mary Katherine "Katye" Ames of Woodhouse Roden Ames & Brennan, LLC, Cheyenne, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]   Capital City Properties, LLC (Capital City Properties) and PNS Stores, Inc. d/b/a Big Lots (Big Lots) entered into a lease which required Capital City Properties to deliver commercial property to Big Lots by a certain date.  Capital City Properties did not timely deliver the property but claimed the failure to do so was the result of Big Lots' breach of the lease and the implied covenant of good faith and fair dealing.  After a bench trial, the district court found Big Lots breached the lease and the implied covenant.  Because the evidence supports the district court's finding that Big Lots breached the implied covenant, we need not decide whether Big Lots also breached the lease.  We affirm.

## ISSUE

[¶2]   Big Lots raises two issues but one is dispositive:

> Did the district court err by finding Big Lots breached the implied covenant of good faith and fair dealing?

## FACTS

### *Execution of Lease*

[¶3]   Joe Anderson is the sole member of Capital City Properties, which owns a large commercial building in Cheyenne.  In Fall 2017, Capital City Properties offered the building for lease through its realtor, Bob Phillips.  Soon thereafter, Big Lots informed Mr. Phillips that it was interested in leasing a portion of the building for the operation of its retail store.

[¶4]   On February 12, 2018, Capital City Properties and Big Lots signed a lease for the property.  Under the lease, Capital City Properties would be primarily responsible for remodeling the building to meet Big Lots' store layout specifications.  The lease required Capital City Properties to provide Big Lots with (1) "a complete set of 'as built' drawings (CAD format) of the Demised Premises adequate for [Big Lots] to produce [its] plans and specifications" (hereinafter "tenant specifications"),[1] and (2) final construction plans within 180 days following execution of the lease.  Big Lots had to approve the final construction plans before Capital City Properties could begin remodeling the building.  For its part, Big Lots was required to submit plans for construction and signage permits to the City of Cheyenne within 90 days of the effective date of the lease and "thereafter diligently pursue obtaining such [p]ermits."  The lease called for Capital City Properties to deliver the remodeled property to Big Lots no sooner than January 1, 2019, but no later than March

---

[1] In general, as-built drawings are a set of plans depicting how the building is currently constructed.

1

1, 2019. If Capital City Properties failed to deliver the property by April 15, 2019, it was to pay Big Lots liquidated damages of $2,500 per day from April 16 to April 30, 2019, and $5,000 per day thereafter.

[¶5]    Capital City Properties hired Michael Potter, a local architect, to prepare the as-built drawings and the final construction plans for the remodel project. On November 14, 2017, while the parties were negotiating the lease, Mr. Potter completed the as-built drawings; they were sent to Big Lots three days later. The November 2017 as-built drawings consisted of a single page showing the current layout of the entire building (including existing offices, restrooms, and a warehouse), its dimensions, and the proposed location of the demising wall which would separate Big Lots' portion of the building from the remaining space. According to the trial testimony, Big Lots would create its tenant specifications from the as-built drawings, and Capital City Properties would use Big Lots' tenant specifications to produce the final construction plans.

### Post-Lease Conduct of Parties

[¶6]    On April 20, 2018, approximately two months after the lease was signed and five months after the as-built drawings were delivered to Big Lots, Mr. Potter contacted Michael Neu, Big Lots' store planning manager, via email to see if there was any progress on Big Lots finishing its tenant specifications so he could begin preparing the final construction plans. Mr. Neu did not respond. On May 1, 2018, Mr. Potter again reached out to Mr. Neu seeking an update on Big Lots' tenant specifications. Mr. Neu responded the same day, stating:

> We've been pretty busy this year and the leasing dept pushed [the Cheyenne] location back on my list. We won't work on that location for a couple months yet.
>
> Unless something has changed I don't know about, it will be a short while before I can get that to you.

[¶7]    On June 19, 2018, Mr. Phillips, Capital City Properties' realtor, emailed Mr. Neu seeking his "best estimate" of when Mr. Potter could expect to receive Big Lots' tenant specifications. Mr. Phillips emphasized Capital City Properties was "interested in having Mr. Potter complete the design so that [it could obtain construction] bid[s] on the project and complete [its] remodel requirements in a timely manner." Mr. Neu never responded to this email.

[¶8]    On July 2, 2018, Mr. Anderson emailed Ryan Romes, Big Lots' real estate manager, stating he was "very disturbed" to learn Big Lots had made no effort to obtain any construction or signage permits even though the lease deadline for doing so was May 13, 2018, 90 days from the lease's effective date. He asked Mr. Romes to "let [him] know

2

right away what [he] intend[ed] to do about this lease violation." Mr. Romes responded the next day, informing Mr. Anderson that the only permit Big Lots needed for the project was a signage permit. He stated Big Lots could not apply for a signage permit without the final construction plans, which Capital City Properties was required to deliver to Big Lots by August 11, 2018, 180 days from execution of the lease. Mr. Romes asked when those plans would be completed.

[¶9] Mr. Anderson responded to Mr. Romes the same day, informing him that Mr. Potter had been "trying . . . for months" to obtain the tenant specifications needed to complete the final construction plans and the only response he received was the May 1 email from Mr. Neu stating Big Lots was busy and he would not work on the project for a couple months. In reply, Mr. Romes apologized for "any perceived delay or lack of communication from [Big Lots]." He claimed Big Lots' store planning team was "wrapping up 200+ projects for 2018 and has had [its] plate full." He also stated Mr. Neu and his team had been hesitant to create the tenant specifications "given the lack of information" on the November 2017 as-built drawings, which Mr. Romes referred to as a lease outline drawing (LOD). He claimed Big Lots had been anticipating additional as-built drawings from Mr. Potter before it began the tenant specifications so it could "understand where the utilities, riser, sewer, etc. are all located and adapt [the] floor plan as needed." While Mr. Romes indicated Mr. Neu and his team could proceed to create Big Lots' tenant specifications with the November 2017 as-built drawings, if they did so, they would "need to trade many more redlines and it could prove more costly."

[¶10] Upon receiving this email, Mr. Anderson immediately called Mr. Potter, who was unaware Big Lots needed additional information, and asked him to obtain the requested information. On July 24, 2018, Mr. Potter provided updated as-built drawings to Mr. Phillips, who forwarded them to Mr. Neu. The updated as-built drawings consisted of four pages depicting the building's existing utility, floor, roof, and north elevation plans, as well as the location of the proposed demising wall.

[¶11] On August 1, 2018, Mr. Anderson and Mr. Romes again exchanged emails. Mr. Anderson asked Mr. Romes to send him Big Lots' tenant specifications so the building remodel could "get back on track." Mr. Phillips contacted Mr. Neu on August 2, 2018, to ensure he received the updated as-built drawings. When Mr. Neu did not respond to Mr. Phillips by August 6, Mr. Phillips e-mailed Mr. Romes seeking his assistance in obtaining Big Lots' tenant specifications. The next day, Mr. Neu responded to Mr. Phillips' August 2 email, stating he received the updated as-builts and would begin preparing Big Lots' tenant specifications in the next few days.

[¶12] On August 13, 2018, Mr. Romes responded to Mr. Phillips' August 6 email. Mr. Romes apparently was unaware Capital City Properties had provided Big Lots with additional as-built drawings and Mr. Neu had already informed Capital City Properties that Big Lots would begin working on its tenant specifications. Mr. Romes told Mr. Phillips:

3

"From our perspective, we are in need of a full set of as-builts of the space in order for our Store Planning team to accurately design our store/footprint. I apologize if there was a lack of communication from our team in that regard . . . ." He claimed that once Big Lots received a full set of as-built drawings, including information regarding the location of the power, sewer, and sprinkler systems, it could complete its tenant specifications. He reiterated that Big Lots would need only a signage permit and admitted it did not apply for one within 90 days as required by the lease. However, he claimed the failure to timely apply for a signage permit was a "nonissue" because "[s]ignage approval happens much later in the process and candidly, we need the completed as-builts of the façade so our signage renderings can be accurate."

[¶13] Mr. Potter responded to Mr. Romes that day and included the updated as-built drawings which had been sent to Mr. Neu on July 24, 2018. Mr. Romes thanked him and said the Big Lots' team would work on the tenant specifications. Later that day, Mr. Phillips asked Mr. Romes when Big Lots would have a response to the July 2018 as-built drawings, reiterating Capital City Properties' objective to timely deliver the property to Big Lots on January 1, 2019. Mr. Romes replied: "Given the timing, I know that Mike Neu has already commissioned someone to draw the plans. It will take a few weeks but I've put everyone on notice that this is a priority. I'll keep pushing things on my end."

[¶14] On August 22, 2018, Mr. Anderson reached out to Mr. Romes seeking the status of Big Lots' tenant specifications. Mr. Romes responded that day stating Big Lots had outsourced the project to a third-party architect to help expedite the process and Big Lots' tenant specifications should be completed "in the next week or so."

[¶15] About a month later, on September 17, 2018, Mr. Anderson again asked Mr. Romes for an update because Capital City Properties had yet to receive Big Lots' tenant specifications. That afternoon, Mr. Neu sent the tenant specifications to Mr. Anderson and Mr. Potter. Mr. Potter began working on final construction plans and, after resolving some questions with Big Lots, provided Big Lots with a draft of the final construction plans on October 30, 2018. Approximately two weeks later and after Capital City Properties contacted Big Lots twice for an update, Mr. Neu informed Mr. Anderson and Mr. Potter that Big Lots was reviewing the draft plans and hoped to have them finalized by the end of the week. After another two weeks and another request by Capital City Properties for an update, Big Lots requested revisions to the draft plans. Mr. Potter raised questions regarding the revisions, which took another month for Big Lots to answer.

[¶16] Capital City Properties delivered final construction plans to Big Lots for its approval on January 3, 2019. Big Lots approved them by January 10, 2019. Capital City Properties remodeled the property and delivered it to Big Lots on August 4, 2019.

**This Lawsuit**

4

[¶17] Capital City Properties filed a complaint against Big Lots alleging breach of contract and breach of the implied covenant of good faith and fair dealing. It sought a total of $172,267.15 in damages, which represented the rent, insurance, real estate taxes and utility payments Big Lots would have paid had it not interfered with Capital City Properties' ability to timely deliver the property. Big Lots answered the complaint and filed a counterclaim alleging Capital City Properties breached the lease by failing to timely deliver the property. It sought $480,000 in liquidated damages.

[¶18] After holding a two-day bench trial, the district court found in favor of Capital City Properties on both of its claims. It determined Big Lots breached the lease by failing to submit its plans for permits to the City by May 13, 2018, within 90 days of the effective date of the lease, and its breach was material as it prevented Capital City Properties from timely delivering the property to Big Lots. It also found Big Lots breached the implied covenant by failing to communicate and work with Capital City Properties in good faith to ensure timely delivery of the property. The court rejected Big Lots' claim for liquidated damages, concluding Capital City Properties would have timely delivered the property had Big Lots not first breached the lease and implied covenant. The court awarded Capital City Properties its requested damages. Big Lots timely appealed.

## STANDARD OF REVIEW

[¶19] We apply the following standard of review following a bench trial in the district court:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence. Findings of fact will not be set aside unless the findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. We review a district court's conclusions of law de novo on appeal.

*Davis v. Harmony Dev., LLC*, 2020 WY 39, ¶ 31, 460 P.3d 230, 240 (Wyo. 2020) (quoting *Ekberg v. Sharp*, 2003 WY 123, ¶ 10, 76 P.3d 1250, 1253 (Wyo. 2003)) (other citations omitted).

5

[¶20] "Whether there has been a breach of the covenant of good faith and fair dealing is a factual inquiry that focuses on the contract and what the parties agreed to." *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 2001 WY 23, ¶ 19, 18 P.3d 645, 654 (Wyo. 2001) (citations and quotation marks omitted). "Contract interpretation presents questions of law which we review de novo." *Larson v. Burton Constr., Inc.*, 2018 WY 74, ¶ 16, 421 P.3d 538, 544 (Wyo. 2018) (citing *Pope v. Rosenberg*, 2015 WY 142, ¶ 21, 361 P.3d 824, 830 (Wyo. 2015)).

## DISCUSSION

[¶21] Big Lots argues the district court erred by finding it materially breached the lease and the implied covenant of good faith and fair dealing.

[¶22] "Wyoming has adopted the Restatement (Second) of Contracts § 205, which states that '[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *Bear Peak Res., LLC v. Peak Powder River Res., LLC*, 2017 WY 124, ¶ 68, 403 P.3d 1033, 1053 (Wyo. 2017) (quoting *Scherer Constr., LLC*, ¶¶ 17-18, 18 P.3d at 652-53). "The implied covenant of good faith and fair dealing is a claim separate and distinct from a breach of contract claim, and the two claims are not mutually dependent." *Id.*, ¶ 68, 403 P.3d at 1054 (citing *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 25, 123 P.3d 579, 589 (Wyo. 2005)). "Thus, a party may breach the implied covenant of good faith and fair dealing even if it did not breach the express terms of the contract." *Id.* (citing *City of Gillette v. Hladky Constr., Inc.*, 2008 WY 134, ¶ 41, 196 P.3d 184, 199 (Wyo. 2008)).

[¶23] The district court awarded Capital City Properties a total of $172,267.15 in damages based on Big Lots' breaches of the lease and the implied covenant. As a result, affirmance of the district court's decision as to one of the breaches resolves this matter. Because we conclude the district court did not err in finding Big Lots breached the implied covenant, we will not address whether it also breached the lease.

> The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement. Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties.

6

*Scherer Constr., LLC*, ¶ 19, 18 P.3d at 653 (internal citations and quotations omitted).

[¶24] Big Lots argues the district court erred by finding its failure to communicate with Capital City Properties breached the implied covenant. According to Big Lots, the evidence showed minimal communication from either party for several months after execution of the lease. It claims there was only one email from Mr. Potter to Mr. Neu in the first four months after the lease was signed. While it admits Mr. Neu did not respond to this email, it maintains the evidence showed the two men did speak on the phone at some point during this general timeframe. Moreover, Big Lots claims Capital City Properties did not object when Mr. Neu told Mr. Phillips on May 1, 2018, the project was not on his priority list, but rather remained silent for approximately seven weeks until Mr. Phillips emailed Mr. Neu on June 19 for a status update. While Mr. Neu did not respond to Mr. Phillips' June 19 email, Big Lots maintains Mr. Anderson and Mr. Romes established communication by July 2, 2018. Big Lots argues "finding bad faith based upon the failure to answer two emails by a mid-level manager [Mr. Neu] is tenuous."

[¶25] Big Lots' argument misstates the evidence. Mr. Potter emailed Mr. Neu twice within four months of execution of the lease—on April 20 and May 1, 2018. Mr. Neu did not respond to Mr. Potter's first email. In response to the second email, he stated he was busy and would not work on the project for a couple months because it was not a priority. Mr. Phillips first emailed Mr. Neu on June 19, 2018.

[¶26] Big Lots' argument also misconstrues the district court's decision. The court did not find Big Lots breached the implied covenant because Mr. Neu failed to respond to two emails. Rather, the court found Big Lots' repeated and lengthy delays in communicating with Capital City Properties, in particular its failure to inform Capital City Properties for eight months that it believed the November 2017 as-built drawings were inadequate, prevented Capital City Properties from delivering the property by the lease deadline. The district court's finding that Big Lots' conduct violated the implied covenant is not clearly erroneous and is supported by the trial evidence.

[¶27] Capital City Properties provided Big Lots with as-built drawings in November 2017. When it failed to receive Big Lots' tenant specifications by April 2018, Capital City Properties contacted Big Lots for an update. Big Lots said it was busy, the project was not a priority, and it would not work on the project for a couple months. Capital City Properties waited "a couple months" and contacted Big Lots for an update. Because its store planning manager, Mr. Neu, did not respond, Capital City Properties and its agents reached out to Mr. Romes, Big Lots' real estate agent, because he "was the only person [from Big Lots] that would respond to [them]."

[¶28] In July 2018, Mr. Romes informed Capital City Properties for the first time that Big Lots believed the November 2017 as-built drawings were insufficient and it needed

7

additional information to complete its tenant specifications. Big Lots provided no justification for why it took eight months to inform Capital City Properties the November 2017 drawings were insufficient. Indeed, Mr. Neu testified he knew within "[a]bout a minute" of viewing the November 2017 as-built drawings that they lacked necessary information, and Mr. Romes stated he knew Big Lots needed more information "as soon as [he] saw" the November 2017 drawings. Upon learning of the need for more information, Capital City Properties provided more detailed drawings to Big Lots within 21 days.

[¶29] After providing Big Lots the updated as-built drawings, Capital City Properties continued to press Big Lots to complete its tenant specifications so Capital City Properties could finish the final construction plans and begin the remodel. Big Lots told Capital City Properties on August 22, 2018, that it would have its tenant specifications within the "next week or so." Big Lots did not complete its tenant specifications until almost four weeks later (September 17, 2018), even though it knew (1) the lease required Big Lots to submit its plans for its signage permit by May 13, 2018, (2) it needed the final construction plans from Capital City Properties to do so, and (3) Capital City Properties could not finish the final construction plans without Big Lots' tenant specifications.

[¶30] Given the actual timeline of events, once Big Lots received the up-dated as-builts on July 24, 2018, it took approximately two months for Big Lots to complete its tenant specifications, another three and a half months for Big Lots to answer questions about plan revisions and to approve final construction plans, and then seven months for Capital City Properties to complete the remodel and deliver the property—a total of twelve and a half months. Applying this timeline, had Big Lots immediately informed Capital City Properties of the need for more information in November 2017 and worked in good faith with Capital City Properties to finish the project, Big Lots would have completed its tenant specifications by January 2018, the final construction plans would have been approved by early May 2018, and the remodel would have been completed and ready for delivery by December 2018, well in advance of January 1, 2019, the earliest delivery date outlined in the lease.

[¶31] Big Lots' failure to promptly communicate and work with Capital City Properties to ensure timely delivery of the property is clearly demonstrated by the emails exchanged between the parties. As the district court found, the emails show "Capital City Properties and its [agents] were always the parties initiating the communication. There are no emails from Big Lots to Capital City Properties or its agents asking them for an update or requesting to move things forward."

[¶32] Big Lots argues the delay in this case was due to Capital City Properties' failure to provide until July 2018 a "complete set of as-built drawings" sufficient for Big Lots to prepare its tenant specifications, as required by the lease. According to Big Lots, Mr. Neu and Mr. Romes both testified the November 2017 drawings were not as-built drawings

8

because they lacked information regarding mechanical, electrical, plumbing, and roofing. While Mr. Potter testified the November 2017 drawings were as-built drawings, Big Lots claims he also admitted they were not a "complete set of as-built drawings" and the July 2018 drawings were more akin to a complete set.

[¶33] The district court was "unwilling to find" the November 2017 drawings were not as-built drawings given Mr. Potter and Mr. Phillips testified they were as-built drawings and Mr. Neu and Mr. Romes admitted they could have produced Big Lots' tenant specifications from them. We cannot say the district court clearly erred in this determination.

[¶34] Mr. Phillips referred to the November 2017 drawings as a "demise plan" but also testified they "could be considered . . . as-built [drawings] because [they are] the dimensions of the building[]." Mr. Potter, a licensed architect since the early 1990s, testified the November 2017 drawings were as-built drawings and "in line with what [he] would normally produce as . . . as-built [drawings]." While he stated on cross-examination that the November 2017 drawings were not a "complete set of as-built drawings," he stated the information contained in them "is accurate and what would have been needed to start somebody . . . laying th[e] project out." He also clarified on redirect that not every set of as-built drawings is the same and the information contained therein varies based on the client. "If a tenant . . . requires certain information for [it] to make determinations as to where [it] want[s] to locate something, then [Mr. Potter] will make specific drawings for that." He testified both the November 2017 and July 2018 drawings were as-built drawings even though the latter had more detail. Moreover, while Mr. Neu and Mr. Romes testified the November 2017 drawings were not complete as-built drawings, Mr. Neu said he could have started a drawing of the building's shell from the November 2017 drawings. Similarly, Mr. Romes stated in his July 3, 2018, email to Mr. Anderson and in his August 13, 2018, email to Mr. Phillips that although it would involve more redlines between the parties, Big Lots could create its tenant specifications with the November 2017 drawings.

[¶35] In any event, the evidence showed any insufficiency in the November 2017 drawings was not the reason for Big Lots' failure to work on the project. Mr. Neu admitted on May 1, 2018, that he was busy, the project was not a priority, and he would not be working on the project for a couple months. He did not, in fact, begin to work on the project until August 2018. Mr. Romes informed Mr. Anderson on July 3, 2018, that Big Lots' store planning team was completing "200+ projects for 2018 and has had [its] plate full." Moreover, as stated above, Big Lots failed to provide any justification for waiting eight months to inform Capital City Properties that it believed the November 2017 as-built drawings were insufficient and it needed more information.

[¶36] Big Lots maintains the district court improperly used the implied covenant to create a new obligation not contained within the lease by requiring it (1) to inform Capital City Properties of its failure to provide a complete set of as-built drawings, even though Capital

9

City Properties was aware of its duty to do so from the lease and the fact it hired Mr. Potter to prepare as-built drawings and (2) to produce its tenant specifications before Capital City Properties provided it a complete set of as-built drawings. We disagree.

> The covenant of good faith and fair dealing may not . . . be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties.

*Scherer Constr., LLC*, ¶ 19, 18 P.3d at 653.

[¶37] The intention of the parties is set out in their lease. The lease required Big Lots to submit plans for its permits by May 13, 2018. As stated above, to meet this deadline, Big Lots needed the final construction plans, which Capital City Properties was required to provide Big Lots by August 11, 2018. To complete the final construction plans, it was undisputed that Capital City Properties needed Big Lots' tenant specifications and, to complete its tenant specifications, Big Lots needed the as-built drawings. As a result, implied in the lease was an obligation for Capital City Properties to provide Big Lots with the as-built drawings and for Big Lots to provide Capital City Properties with its tenant specifications in sufficient time for Capital City Properties to complete the final construction plans prior to May 13, 2018, so Big Lots could timely submit its plans for a signage permit. The lease also clearly indicated the intention of the parties that all necessary work (tenant specifications, development and approval of plans, and construction) would be completed so the premises could be delivered in January or February 2019. These dates in the lease created an indispensable duty on the part of Big Lots to timely review the as-built drawings and to notify Capital City Properties if they were inadequate. In other words, as the district court found, the lease "required both parties to work in conjunction with one another so their respective goals could be met," including requesting information from the other if necessary to meet its lease obligations.

[¶38] Big Lots relies on *Hladky* and *White* for the proposition that the district court re-wrote the lease to impose on Big Lots the duty to inform Capital City Properties the November 2017 drawings lacked information and to produce its tenant specifications before Capital City Properties provided it a complete set of as-built drawings. In *Hladky*, the City of Gillette breached the implied covenant when it interfered with and failed to cooperate with the contractor's ability to perform its contractual duties by orally modifying the building contract and failing to timely act on the contractor's request for a change order. *Hladky Constr., Inc.*, ¶¶ 35-40, 196 P.3d at 197-99. In *White*, we concluded the landlords did not breach the implied covenant by exercising their contractual right to terminate the lease if the tenant violated the lease. *White*, ¶¶ 22-23, 285 P.3d at 956. Neither *Hladky* nor *White* is instructive. As we stated above, the district court did not rewrite the lease by

10

finding Big Lots breached the implied covenant. It simply required Big Lots to work in good faith with Capital City Properties to ensure both parties met their contractual obligations, the essence of the implied covenant.

[¶39] Big Lots claims its conduct does not constitute bad faith because it did not "stand in the way or otherwise prevent Capital City [Properties] from completing and delivering complete as-built drawings[.]" It asserts our decision in *Scherer* is an applicable example of when such bad faith exists. However, we did not find the general contractor's conduct in *Scherer* violated the implied covenant. Instead, we adopted § 205 of the Restatement (Second) of Contracts, which addresses the implied covenant of good faith and fair dealing in a contract situation, and held for the first time "that parties to a commercial contract may bring a claim for breach of the implied covenant of good faith and fair dealing based on a contract theory." *Scherer Constr., Inc.*, ¶¶ 16-17, 24, 18 P.3d at 652, 655. Because the district court had failed to consider the plaintiff's implied covenant claim based on contract, we reversed and remanded for further proceedings. *Id.*, ¶ 25, 18 P.3d at 656. *Scherer* does not support Big Lots' argument.

[¶40] To the contrary, comment (d) to § 205 of the Restatement, which we adopted in *Scherer,* supports the district court's conclusion against Big Lots. It describes breaches of the implied covenant in the performance of a contract:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Restatement (Second) of Contracts § 205 cmt. d (1981). The district court, in essence, found Big Lots violated the implied covenant by "lack of diligence," "slacking off," and "failure to cooperate in the other party's performance." The evidence supports the district court's findings.

## CONCLUSION

[¶41] The district court did not err by finding Big Lots breached the implied covenant of good faith and fair dealing by failing to communicate and work with Capital City Properties in good faith to ensure timely delivery of the property.

11

[¶42]  We affirm.