# IN THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 114

## OCTOBER TERM, A.D. 2023

November 30, 2023

IN THE MATTER OF U.S.
CURRENCY TOTALING $75,000.00:

THE STATE OF WYOMING,

Appellant
(Plaintiff),

v.

LORENZO GALLAGA,

Appellee
(Defendant).

S-23-0048

*Appeal from the District Court of Laramie County*
The Honorable Catherine R. Rogers, Judge

*Representing Appellant:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Kellsie J. Singleton, Senior Assistant Attorney General. Argument by Ms. Singleton.

*Representing Appellee:*
> Donald E. Miller, Miller Law Firm, Cheyenne, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    After law enforcement seized $75,000 in United States currency from Lorenzo Gallaga, the State of Wyoming filed a civil *in rem* action for forfeiture of the currency. The district court denied forfeiture because it decided the State had failed to meet its burden of showing Mr. Gallaga's presence in Wyoming with the currency was an act in furtherance of a conspiracy violative of the Wyoming Controlled Substances Act.  It concluded Mr. Gallaga was merely passing through Wyoming with the currency, which was insufficient to establish a violation of the Wyoming Controlled Substances Act.  We reverse the district court's order because it erred in applying Wyoming's forfeiture and controlled substances laws.

## ISSUE

[¶2]    Did the district court err in applying Wyoming's civil forfeiture and controlled substances laws when it denied the State's request for forfeiture of the currency?

## FACTS

[¶3]    On July 29, 2020, a Wyoming highway patrol trooper stopped Mr. Gallaga for speeding while he was driving westbound on Interstate 80 in Laramie County.  Mr. Gallaga told the trooper he was traveling from Illinois to California.  As they were talking, the trooper smelled raw marijuana; when questioned about the smell, Mr. Gallaga "produced a carton of hemp cigarettes as the explanation for the odor."  The trooper detained Mr. Gallaga to search the vehicle, which yielded $75,000 in U.S. currency and numerous controlled substances including marijuana, concentrated tetrahydrocannabinols (THC), and MDMA (otherwise known as Ecstasy).  Law enforcement also discovered five cell phones and written records showing transactions involving the sale of marijuana products. Downloads from the cell phones revealed voicemails discussing what law enforcement believed to be marijuana growing and distribution operations.

[¶4]    Mr. Gallaga was arrested for possession of controlled substances and agreed to be interviewed by law enforcement.  He admitted to possession of items, which testing confirmed had illegal amounts of THC.  He explained the currency had come from "his bank" and said he planned to use it to purchase real property in Illinois to grow cannabis. He claimed he had earned the money "over the course of . . . working" in "his businesses," which included the "sneaker and cannabis trades," "house flipping," and renting out properties he owned in California.

[¶5]    The State filed a civil *in rem* action for forfeiture of the $75,000 found in Mr. Gallaga's possession, claiming it was proceeds from, or used to facilitate, activities which violated the Wyoming Controlled Substances Act. Wyo. Stat. Ann. §§ 35-7-1001 through 35-7-1063 (LexisNexis 2023).  *See also, Matter of U.S. Currency Totaling $14,245.00,*

1

2022 WY 15, ¶ 21, 503 P.3d 51, 57 (Wyo. 2022) ("[t]he forfeiture statute states that '[t]he proceedings and judgment of forfeiture shall be in rem and shall be against the property itself'" (quoting § 35-7-1049(q))). The district court held a bench trial on the State's forfeiture petition, issued detailed findings of fact and conclusions of law, and denied the State's request. The State appealed. We will provide additional facts in our discussion of the issues.

## STANDARD OF REVIEW

[¶6] The district court conducted a bench trial on the State's request for forfeiture of the $75,000 found in Mr. Gallaga's vehicle. The court's factual findings "'are not entitled to the limited review afforded a jury verdict.'" *Galiher v. Johnson,* 2018 WY 145, ¶ 6, 432 P.3d 502, 507 (Wyo. 2018) (quoting *Graybill v. Lampman*, 2014 WY 100, ¶ 25, 332 P.3d 511, 519 (Wyo. 2014), and *Helm v. Clark*, 2010 WY 168, ¶ 6, 244 P.3d 1052, 1056 (Wyo. 2010)). Instead, we review the factual findings for clear error. *PNS Stores, Inc. v. Capital City Props., LLC,* 2022 WY 101, ¶ 19, 515 P.3d 606, 611 (Wyo. 2022) (citing *Davis v. Harmony Dev., LLC*, 2020 WY 39, ¶ 31, 460 P.3d 230, 240 (Wyo. 2020), and *Ekberg v. Sharp*, 2003 WY 123, ¶ 10, 76 P.3d 1250, 1253 (Wyo. 2003)).

> While the factual findings of a [district court] are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence. . . . A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. We assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.

*TEP Rocky Mountain LLC v. Record TJ Ranch Ltd. P'ship,* 2022 WY 105, ¶ 37, 516 P.3d 459, 472 (Wyo. 2022) (quoting *Shriners Hosps. for Children v. First N. Bank of Wyo.,* 2016 WY 51, ¶ 27, 373 P.3d 392, 403 (Wyo. 2016) (quotation marks, brackets, and citations omitted)). *See also, Bowman v. Study,* 2022 WY 139, ¶ 9, 519 P.3d 985, 988 (Wyo. 2022). We review the district court's conclusions of law de novo. *Galiher,* ¶ 6, 432 P.3d at 507 (citation omitted).

## DISCUSSION

[¶7] Wyo. Stat. Ann. § 35-7-1049 identifies the types of property subject to civil forfeiture. *Matter of United States Currency Totaling $470,040.00,* 2020 WY 30, ¶ 18,

459 P.3d 430, 435 (Wyo. 2020) ("Civil asset forfeiture under Wyo. Stat. Ann. § 35-7-1049 'is appropriate only with respect to certain types of property which the legislature has deemed to be subject to forfeiture.'" (quoting *State v. Eleven Thousand Three Hundred Forty-Six Dollars & No Cents in U.S. Currency*, 777 P.2d 65, 67 (Wyo. 1989) (some quotation marks and citations omitted))). As relevant to this case, § 35-7-1049(a)(viii) permits forfeiture of "property or other thing of pecuniary value furnished in exchange for a controlled substance in violation of this act including any proceeds, assets or other property of any kind traceable to the exchange and any money . . . used to facilitate a violation" of the Wyoming Controlled Substances Act. Consequently, forfeiture is proper if the money was shown to be (1) "furnished in exchange for a controlled substance" in violation of the Wyoming Controlled Substances Act, or (2) "used to facilitate" a violation of the Wyoming Controlled Substances Act. *Id.* The essence of the district court's decision was that the evidence was insufficient to show a violation of the Wyoming Controlled Substances Act.

[¶8]    The State has the burden of proving "by clear and convincing evidence the extent to which, if any, the property is subject to forfeiture." Section 35-7-1049(k). "'Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of a contention is highly probable.'" *Ailport v. Ailport,* 2022 WY 43, ¶ 35, 507 P.3d 427, 440 (Wyo. 2022) (quoting *In re JPL,* 2021 WY 94, ¶ 21, 493 P.3d 174, 180 (Wyo. 2021), and *Harmon v. State of Wyo., Dep't of Family Servs. (In re DKS)*, 2020 WY 12, ¶ 19, 456 P.3d 918, 924 (Wyo. 2020)).

[¶9]    The district court's findings of fact are undisputed. It found law enforcement seized illegal controlled substances and $75,000 in currency from Mr. Gallaga. Law enforcement also discovered five cell phones in Mr. Gallaga's vehicle, which contained numerous voicemails from 2018 through 2020. The messages were from: an unidentified caller referring to "the freshest nicest greenish shiniest, yumm yumm yumm[] that we're looking for"; another person encouraging Mr. Gallaga to "wait no longer to get those plants in the dirt dude, every day that you['re] waiting you['re] losing"; "Steve" telling Mr. Gallaga to "grab those dudes and come over here as soon as possible, greenhouse #2 collapsed, the cookie one, the one we're harvesting, so I'm gonna start cutting it up and just getting it into bins, so hurry up"; callers referring to "shipments" and "weed"; "Daryl" stating "[h]ey, get ahold of me I need to see if I can get that 4gg[]s from ya"; another caller saying "I was going to get some of that mac now all of a sudden Steve says I gotta talk to you before I get any of the mac"; and "Daniel" at Hendrx Farms. A Division of Criminal Investigation (DCI) agent testified: the voicemails referred to strains of marijuana "that contained above 0.3% THC," including "yum yum," "4GGs" ("Gorilla Glue"), "cookie," and "MAC" ("Magic Alien Cookie"); a number of the messages pertained to marijuana cultivation and production, such as mentions of "plants" and "greenhouses"; and Hendrx Farms was a "clone nursery in northern California . . . specializ[ing] in selling marijuana clones."

3

[¶10]  The district court also found Mr. Gallaga owned farmland and a trailer in California and the financial documentation he provided in discovery did not identify a legal source of the funds he used to acquire the properties.  Mr. Gallaga said he was renting out the farmland, but "he did not know what the tenants were renting these properties for or what the renters were growing" on it.  Law enforcement also seized documents and other paperwork from Mr. Gallaga's vehicle, including receipts for "agricultural supply purchases" and ledgers showing "marijuana variants" and "transactions" involving "quantities of strains of marijuana multiplied by a given price."  The combined "value of the transactions listed on the ledgers found in [Mr.] Gallaga's vehicle" was "approximately $130,000.00."

[¶11]  Mr. Gallaga admitted the currency found in the vehicle belonged to him and said he got it "out of [his] bank."  He told law enforcement "he intended to use [it] . . . for a real estate transaction in Illinois."  When asked why he was transporting the currency west to California if he was going to use it to purchase property in Illinois, he said he did not "feel safe with money in the bank," even though he initially said it came from his bank and admitted he had several bank accounts.  The district court accepted a DCI agent's testimony that through his "longstanding experience . . ., [he] typically understood that the drug trafficking conduct on Interstate 80 involved drugs moving eastbound[] and corresponding money proceeds moving westbound."

[¶12]  The district court noted Mr. Gallaga made numerous transactions through his bank accounts, which conflicted with his claim that he was transporting a large amount of currency because he did not trust banks.  His bank records showed significant deposits into, and withdrawals or payments from, his accounts in 2020, but the district court accepted a DCI agent's testimony that "none of those bank records showed "a transaction [in 2020] that would correspond to [Mr.] Gallaga withdrawing a sufficient amount of currency at once to explain the source of the $75,000[] he possessed during the traffic stop."

[¶13]  The district court doubted Mr. Gallaga's various explanations for the sources of the currency.  Mr. Gallaga said it came from his businesses "over the course of my working."  First, he claimed he had "legally" earned the money when he "cashed out" of the "sneaker trade" in 2012.  The district court noted, however, his tax records "showed [his] only source of income [for 2012] was $5,856 in unemployment compensation."  Mr. Gallaga also said he earned "a quarter million in sneakers" in 2013, but his tax records showed only $52,000 in gross receipts and an overall loss of more than $20,000 for that year.  Mr. Gallaga also said he acquired cash from "house flipping" and renting his properties in California.  When asked for details, Mr. Gallaga said it had been "some time since he flipped any houses" and denied knowing "Zach Smith" who had paid him $950 on Venmo as "rent."  He admitted he had been involved in the "cannabis trade" until 2017 but said he had only purchased marijuana for his personal use since then.

4

[¶14]  The district court recited testimony from a realtor who "worked with [Mr.] Gallaga [in the spring and summer of 2020] to find property in Illinois where [Mr.] Gallaga intended to farm cannabis."  The realtor said Mr. Gallaga planned to purchase the property in cash, but cautioned that "under Illinois law, United States currency is not an acceptable form of payment in a real estate closing for transactions of $50,000 or more; thus[,] a cashier's check or some other wire transaction is required."

[¶15]  Based upon its findings of fact, the district court concluded the State "proved by clear and convincing evidence that, on and prior to July 29, 2020, [Mr.] Gallaga was actively engaged in the cultivation, promotion, use, sale, and distribution of controlled substances" in other states, specifically California and Illinois.  Nevertheless, it ruled the $75,000 was not subject to forfeiture because the State did not "prove any date or location of any purported or intended exchange" of money for controlled substances, "no dollar amount of such an exchange, no specific quantity of controlled substance, and no identified participant other than [Mr.] Gallaga."  According to the court, the State did not prove Mr. Gallaga "intended to, or did, business of any sort in Wyoming" or that the currency "was furnished in exchange for a controlled substance in violation of the Wyoming Controlled Substances Act[.]"  Instead, Mr. Gallaga merely "pass[ed]-through" Wyoming with the currency.  In other words, the district court concluded Mr. Gallaga had not violated the Wyoming Controlled Substances Act.

[¶16]  The State does not contest the district court's findings of fact; however, it claims the court erred when it interpreted the relevant law and applied it to the facts of this case.  As we stated above, the State was required to present clear and convincing evidence the currency seized from Mr. Gallaga was "traceable to the exchange of a controlled substance or otherwise used to facilitate a violation of the Wyoming Controlled Substances Act."  *See Eleven Thousand Three Hundred Forty-Six Dollars,* 777 P.2d at 68.  The State claimed the applicable violation of the Wyoming Controlled Substances Act was the crime of conspiracy as defined in § 35-7-1042.  A person violates that provision if he "attempts or conspires to commit any offense under this article within the state of Wyoming or . . . conspires to commit an act beyond the state of Wyoming which if done in this state would be an offense punishable under this article."  Section 35-7-1042.  "[T]his article" means Article V of the Wyoming Controlled Substances Act, which prohibits the planting, cultivating, harvesting, drying, and processing of marijuana, *see* § 35-7-1040, the "manufacture [or] deliver[y]" of Schedule I controlled substances, and the "possess[ion] with intent to manufacture or deliver" such substances, *see* § 35-7-1031(a)(ii).  *Baker v. State,* 2010 WY 6, ¶ 36, 226 P.3d 542, 557 (Wyo. 2010) ("Considering the structure of the Act, the term 'this article' as used in § 35-7-1042 looks to mean article V of the Act.").  Marijuana (spelled marihuana in the Wyoming Controlled Substances Act) and products containing more than three-tenths of one percent (0.3%) of THC are illegal Schedule I hallucinogenic controlled substances.  *See* Wyo. Stat. Ann. § 35-7-1014(d)(xiii), (xxi); Wyo. Stat. Ann. § 35-7-1063(a)-(b) (exempting from the Wyoming Controlled Substances Act hemp products with "a trans-delta 9-tetrahydrocannabinol (THC) concentration of not

5

more than three-tenths of one percent (0.3%) on a dry weight basis"); *Roman v. State,* 2022 WY 48, ¶ 13, 507 P.3d 453, 457 (Wyo. 2022) (marijuana is a controlled substance, but hemp is not).

[¶17]   The elements of a conspiracy involving controlled substances under § 35-7-1042 are:

> "(1) at least a tacit understanding between the defendant and a coconspirator to commit an act violative of Wyoming's controlled substances act, and (2) intent by the defendant to commit the elements of the offense which was the object of the understanding."

*Ekholm v. State,* 2004 WY 159, ¶ 22, 102 P.3d 201, 207 (Wyo. 2004) (quoting *Sotolongo– Garcia v. State,* 2002 WY 185, ¶ 14, 60 P.3d 687, 690 (Wyo. 2002)).  Section 35-7-1042 requires proof of a bi-lateral conspiracy involving "'an agreement between two or more people to commit an unlawful act.'"  *Baker,* ¶ 30, 223 P.3d at 554 (quoting *United States v. Escobar de Bright,* 742 F.2d 1196, 1199 (9th Cir. 1984)).  *See also, Mitchell v. State,* 2020 WY 142, ¶ 36, 476 P.3d 224, 238 (Wyo. 2020) (to prove a conspiracy under the Wyoming Controlled Substances Act, the State is required to provide evidence of a bi-lateral agreement).  The State is not, however, required to prove the identity of the co-conspirators.  *See Marquez v. State,* 12 P.3d 711, 716 (Wyo. 2000) (there was sufficient proof the defendant conspired with his supplier to deliver controlled substances even though the supplier was not named); *Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 443,  95 L.Ed. 344 (1951) ("the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown" ); *United States v. Delarosa Arias,* 979 F.3d 80, 82 (1st Cir. 2020) (a person can be convicted for conspiring with persons whose names are unknown to the government (citing *United States v. Penagaricano-Soler*, 911 F.3d 833, 840 n.5 (1st Cir. 1990), and *Rogers*, 340 U.S. at 375, 71 S.Ct. at 443)).

[¶18]   Section 35-7-1042 also does not require the State to prove the co-conspirators performed an overt act in furtherance of the conspiracy.  *Baker,* ¶¶ 27, 30, 223 P.3d at 550, 554 (unlike the general conspiracy statute found at Wyo. Stat. Ann. § 6-1-303 (LexisNexis 2023), § 35-7-1042 does not require proof that one or more of the co-conspirators did "'an overt act to effect the objective of the agreement.'" (quoting § 6-1-303(a))).  However, evidence of an overt act may be relevant to show a person has conspired with another to engage in an act violative of Wyoming's controlled substances laws.  *See Innis v. State,* 2003 WY 66, ¶ 11, 69 P.3d 413, 418 (Wyo. 2003) (an overt act which occurs in Wyoming can demonstrate the continuation of a conspiracy).  The overt act does not have to be criminal; it may be "wholly innocent in nature, provided it furthers the purpose of the conspiracy . . . [and] manifests that the conspiracy is at work." *Innis,* ¶ 10, 69 P.3d at 417-18.  "'Due to the covert nature of the crime, circumstantial evidence may be relied upon to

establish the conspiracy.'" *Ekholm,* ¶ 22, 102 P.3d at 207 (quoting *Sotolongo-Garcia,* ¶ 14, 60 P.3d at 690). Proof of a conspiracy may include "'inferences drawn from the course of conduct of the alleged conspirators.'" *Id.,* ¶ 22, 102 P.3d at 208 (quoting *Martinez v. State,* 943 P.2d 1178, 1183 (Wyo. 1997)) (quotation marks and other citation omitted).

[¶19] When the correct law is applied to the district court's undisputed factual findings, it is clear the State satisfied its burden for forfeiture of the currency.[1] As the district court found, the above evidence plainly showed that, when Mr. Gallaga was stopped in Wyoming with the currency, he was engaged with others in activities related to the cultivation, promotion, use, sale, and distribution of controlled substances, actions which would be illegal under the Wyoming Controlled Substances Act if committed in Wyoming. *See* § 35-7-1031(a)(ii) and § 35-7-1040. The evidence also clearly demonstrated he had an understanding with others (i.e., Steve, Daryl, Daniel, and other "dudes") to engage in these activities and he had the specific intent to accomplish the underlying controlled substances crimes. *See Ekholm,* ¶ 22, 102 P.3d at 207. Contrary to the district court's ruling, the State was not required to specifically identify Mr. Gallaga's co-conspirators to prove a conspiracy under § 35-7-1042. *See Marquez,* 12 P.3d at 716 (there was sufficient proof the defendant conspired with his supplier to deliver controlled substances even though the supplier was not named); *Rogers,* 340 U.S. at 375, 71 S.Ct. at 443 (same).

[¶20] The district court also ruled it did not have subject matter jurisdiction over the conspiracy and, thus, the currency. It determined Wyoming was simply a "pass-through" state for Mr. Gallaga, and the State failed to prove Mr. Gallaga "intended to, or did, business of any sort in Wyoming." We have said

> a conspiracy is a continuing offense[,] and it lasts until the final overt act is completed. "Every act in furtherance of it is deemed a renewal or continuance of the conspiracy." 15A C.J.S. *Conspiracy* § 104. We embrace the view that conspiracy is a continuing offense with a situs at the place of the original agreement and also in any other jurisdictions where acts in furtherance of the conspiracy are undertaken. 4 Wayne R. LaFave, Jerold H. Israel and Nancy J. King, *Criminal Procedure* § 16.4(c) at 579 (2d ed. 1999).

*Innis,* ¶ 10, 69 P.3d at 417.

[¶21] *Innis* demonstrates the reach of Wyoming's jurisdiction in prosecuting controlled substance conspiracies. Mr. Innis and others traveled to Wyoming to purchase cold

---

[11] Mr. Gallaga's argument relies little upon the district court's specific factual findings; instead, he presents his own version of the evidence. Our standard of review requires us to accept the district court factual findings unless they are clearly erroneous; neither party argues the court clearly erred in its factual findings. *See TEP,* ¶ 37, 516 P.3d at 472.

7

medication to use for manufacturing methamphetamine in Colorado. *Innis*, ¶ 6, 69 P.3d at 416. Although purchasing the cold medication was not illegal and the conspirators did not intend to manufacture methamphetamine in Wyoming, we ruled the district court had jurisdiction over charges associated with a conspiracy to produce illegal controlled substances because purchasing the cold medication in this state was an overt act in furtherance of the conspiracy. *Id.*, ¶ 11, 69 P.3d at 418. *See generally, Mitchell,* ¶¶ 4, 9, 13, 19, 476 P.3d at 229-32 (evidence that co-conspirators had mistakenly driven through Wyoming with a carload of marijuana was relevant in establishing a conspiracy to deliver controlled substances even though there was no evidence they intended to conduct illegal drug business in Wyoming). Similarly, Mr. Gallaga furthered the conspiracy to cultivate and distribute marijuana by transporting currency related to the criminal enterprise through Wyoming.

[¶22] The district court incorrectly concluded Wyoming did not have jurisdiction over the conspiracy because Mr. Gallaga simply "pass[ed] through" the state with the currency. In *United States v. McIntosh,* 514 F. App'x 783, 787 (10th Cir. 2013), the Tenth Circuit ruled the Kansas federal district court could prosecute a drug distribution conspiracy because the co-conspirators performed an overt act in Kansas by routinely driving through the state with cash they used to purchase controlled substances in Arizona. "'Driving a vehicle and carrying cash are both overt acts.'" *Id.* (citing *United States v. Record,* 873 F.2d 1363, 1370 (10th Cir. 1989) (approving jury instruction that said an overt act for venue purposes "may be as innocent as the act of a man walking across the street, or driving an automobile, or using a telephone"), *United States v. Bailon–Santana,* 429 F.3d 1258, 1262 (9th Cir. 2005) (driving a car), and *United States v. Fernandez,* 559 F.3d 303, 327 (5th Cir. 2009) (loading cash into a truck)). Likewise, Mr. Gallaga committed an overt act in furtherance of the drug conspiracy by driving through Wyoming with the currency.

[¶23] The State also proved the $75,000 was proceeds of, or used to facilitate, a conspiracy to cultivate and distribute marijuana, as required for forfeiture under § 35-7-1049(a)(viii). Contrary to the district court's conclusion, the State was not required to show the currency was proceeds from a specific transaction or exchange of controlled substances so long as it proved a connection between the currency and the conspiracy to engage in conduct which would violate the Wyoming Controlled Substances Act. Applying comparable federal forfeiture law, the Tenth Circuit stated the government is not required to show the proceeds of drug trafficking "came from any particular drug transaction, or such details as the time, location, or amount per transaction" to justify the forfeiture. *United States v. $189,825.00,* 216 F.3d 1089, No. 98-5227, 2000 WL 870500, *5 (10th Cir. June 30, 2000) (unpublished) (applying 21 U.S.C. § 881(a)(6) ("[a]ll moneys . . . furnished . . . by any person in exchange for a controlled substance . . . in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter" are subject to forfeiture), and citing *United States v. $36,634,* 103 F.3d 1048, 1053 (1st Cir. 1997), and *United States v. $4,255,000,* 762 F.2d 895, 904 (11th Cir. 1985)). More recently, the Kansas federal district court reiterated "the government is not

required to show that the currency is the proceeds of a particular drug transaction" for civil forfeiture. *United States v. $21,055.00 in U.S. Currency,* 778 F.Supp.2d 1099, 1103 (D. Kan. 2011) (citing *United States v. $4,790.00 in U.S. Currency,* 2006 WL 359955 at *5 (C.D. Ill. 2006), and *United States v. $147,900.00 in U.S. Currency,* 2009 WL 903356 at *8 (M.D.N.C. Mar. 31, 2009)).

[¶24] Mr. Gallaga provided various explanations of the origins of the $75,000, but his financial records did not show a legitimate source of the currency. A large quantity of currency may be subject to forfeiture if the evidence shows the owner lacked legitimate income to account for it. *United States v. $175,206.00 in U.S. Currency,* 320 F.3d 658, 662 (6th Cir. 2003); *$21.055.00,* 778 F.Supp.2d at 1105. The ledgers in Mr. Gallaga's possession recorded $130,000 worth of marijuana sales which explained the source of the funds. *See generally, Matter of U.S. Currency Totaling $7,209.00,* 2012 WY 75, ¶ 9, 278 P.3d 234, 237 (Wyo. 2012) ("pay/owe sheet" was evidence the confiscated currency was proceeds of illegal drug activities); *United States v. $149,442.00,* 965 F.2d 868, 877 (6th Cir. 1992) (In a federal forfeiture case, "[t]he unusually large amount of hidden currency, the presence of drug paraphernalia, including packaging supplies and drug notations reflecting large drug transactions, establishes a sufficient nexus between the defendant property and claimant Fisher's involvement in drug trafficking."). Furthermore, Mr. Gallaga admitted he intended to use the currency to purchase property in Illinois to cultivate marijuana, an action that would, if undertaken in Wyoming, be illegal. The currency was no less a tool of his drug trade than the cold medication in *Innis*.

## CONCLUSION

[¶25] The district court erred by denying the State's civil forfeiture claim. The State met its burden of proving by clear and convincing evidence the $75,000 seized from Mr. Gallaga was traceable to the exchange of controlled substances or otherwise used to facilitate activities which, if undertaken in this state, would violate the Wyoming Controlled Substances Act.

[¶26] Reversed and remanded for entry of a forfeiture order in favor of the State.